INCORPORATED VILLAGE OF CORNWALL, Respondent, *v.* ENVIRON-
MENTAL PROTECTION ADMINISTRATION OF THE CITY OF NEW YORK
et al., Appellants.

Second Department, July 8, 1974.

*Adrian P. Burke, Corporation Counsel* (*Evelyn J. Junge* and *Gary Mailman* of counsel), for appellants.

*Raymond H. Bradford* (*Richard A. Howard* of counsel), for respondent.

CHRIST, J.  In this proceeding pursuant to article 78 of the CPLR, the appeal is from a judgment of the Special Term in Orange County which (1) annulled a determinatioin of appellant Commissioner of the Department of Water Resources of the Environmental Protection Administration of the City of New York denying the petitioner village's application for a permit to tap the Catskill Aqueduct and (2) directed the commissioner to issue such permit, subject to reasonable rules and regulations to be established by him.

The instant proceeding is one of the many prolonged and volatile debates emanating from the attempt of the Consolidated Edison Company (hereafter " Con Ed ") to construct a power station on Storm King Mountain, in the Hudson River Valley. As part of this project, Con Ed requires and will buy the existing upper reservoir of the Village of Cornwall.

In order to assist Con Ed and also to secure the additional water that the village needs because of its increasing population, the village seeks permission to tap in to the water supply system of the City of New York which passes through the village.  Sometime in 1963, the village applied to the Department of Water Supply, Gas and Electricity of the city, the predecessor of the appellant commissioner, for permission to " tap-in " to the city's Catskill Aqueduct pursuant to title K of chapter 51 of the Administrative Code of the City of New York.  The Catskill Aqueduct is a main conduit of one of several water systems supplying the city.  The Catskill system provides approximately 40% of the city's potable water supply.  On November 30, 1965, the city agency granted conditional approval to the village.  The conditions were ministerial in nature and would not affect the basic right of the village to tap the main.

In reliance on this approval, the village commenced construction of the various facilities and pipes necessary for the " tap-in " and its new water supply.  A new filter plant, among other things, was constructed at a cost in excess of $900,000. All the pipes were laid up to the Aqueduct and it is undisputed that only the " cut and cover ", or actual tap-in, remains to be done.  Notwithstanding the foregoing, and after many letters

were exchanged, the appellant commissioner, by letter dated March 14, 1973, "withdrew" the original approval. The letter states that the city disapproves of the Con Ed facility and fears that the project, in particular the proposed blasting and ground removal operations which Con Ed will undertake, will endanger the Catskill Aqueduct.

It is the position of the city that if it denies the permit the village will not be able to transfer its own reservoir to Con Ed and, without this reservoir, Con Ed will not be able to complete its Storm King project. Specifically, the commissioner wrote the village that the permit was denied because "such permission will aid a project threatening the integrity of the Aqueduct itself." That determination was annulled by the judgment of the Special Term which is the subject of this appeal, as hereinabove stated.

Although Con Ed is not a party to the instant proceeding, its Storm King project underlies this litigation. A perusal of that project is therefore in order.

In 1963, Con Ed applied to the Federal Power Commission (hereafter "FPC") for a license to construct and operate a pumped storage plant to generate electric energy for use during peak load periods. The system would use hydroelectric units driven by water from a headwater pool or reservoir. The three primary components of the system are a storage reservoir, a powerhouse and transmission lines. The installation is to have a capacity of 2,000,000 kilowatts, with an enlargement capability of 3,000,000 kilowatts. The storage reservoir would connect to the powerhouse, 1,000 feet below, by means of a 40-foot in diameter tunnel. When pumping, the powerhouse would draw approximately 1,080,000 cubic feet of water per minute from the Hudson River and, when generating, it would discharge up to 1,620,000 cubic feet of water per minute into the river. The facility would be the largest such system in the world. One court aptly described the physical configuration as follows: "The water in the upper reservoir may be regarded as the equivalent of stored electric energy; in effect, Consolidated Edison wishes to create a huge storage battery at Cornwall" (*Scenic Hudson Preservation Conference* v. *Federal Power Comm.*, 354 F. 2d 608, 612 [2d Cir., 1965] [hereafter "*Scenic I*"]).

Immediately after Con Ed's application, problems and controversy arose. The articles, hearings, litigation and editorials on this subject are legion. After an extensive hearing, the Federal Power Commission issued a license to Con Ed

to proceed with its plan. However, on appeal, that determination was set aside and the matter remanded to the FPC for further consideration (*Scenic I, supra*). The new hearing was equally extensive, encompassing over 100 hearing days, eliciting testimony of 60 expert witnesses and requiring 19,000 pages of testimony. During the course of the second hearing, Con Ed altered its plans and provided for the powerhouse to be constructed underground. This change required the facility to be moved from its original spot and necessitates extensive blasting and rock removal. The hearing examiner again recommended issuance of the license, but, at the behest of the City of New York, the hearing was reopened to allow the city to introduce evidence as to the possible hazards to its Aqueduct System, in particular the Catskill Aqueduct and the Moodna Tunnel. By decision dated December 23, 1969 the hearing examiner reissued the license, stating that there was "no appreciable hazard to the Aqueduct" (*Scenic Hudson Preservation Conference* v. *Federal Power Comm.*, 453 F. 2d 463, 470 [2d Cir., 1971] [hereafter "*Scenic II* "]). Again the FPC's determination was appealed, with the city as one of the litigants, but this time the Circuit Court of Appeals upheld the issuance of the license by a split decision (*Scenic II, supra*). The city's argument that the Storm King project threatened its water system was specifically rejected by the court, although Circuit Judge OAKES dissented in a strong opinion (*Scenic II, supra*, p. 482 *et seq.*).

Con Ed next applied to the Department of Environmental Conservation of the State of New York for a certificate of reasonable assurance that the Storm King project would not violate or contravene water quality standards applicable to the waters of the Hudson River. Again, extensive hearings were held and, in August, 1971, the certificate was issued. Several environmentalist organizations, municipalities and the City of New York then commenced an article 78 proceeding to review the State agency's determination. However, the proceeding was dismissed and the dismissal was unanimously affirmed by the New York Court of Appeals (*Matter of De Rham* v. *Diamond*, 32 N Y 2d 34). Among other points, Chief Judge FULD, writing for the unanimous court, specifically discussed the city's objection concerning damage to the Catskill Aqueduct. Thus, he noted that it was at the city's request that the FPC reopened its hearing to take testimony on this very question and that "following the taking of extensive engineering testimony from a number of the country's foremost authorities on the subject,

the Commission [FPC] found that the Aqueduct's safety would not be jeopardized and, on appeal, the [Circuit] Court of Appeals '' upheld the commission (p. 52). He stated further (p. 53): ''We thoroughly agree with the Commissioner and Con Ed that it is improper to relitigate the Aqueduct matter in this proceeding. It is an issue already litigated between the same parties in the Federal courts and may well be concluded by the doctrine of *res judicata.* (See, e.g., *City of Tacoma* v. *Taxpayers,* 357 U. S. 320, 334 *et seq.* * * *.) ''

The *De Rham* proceeding and the instant one are only two of the many suits the city has utilized to relitigate the Aqueduct issue. The Aqueduct issue and Storm King have even been raised at ''rate hearings'' before the Public Service Commission.

Turning now to the merits of the instant proceeding, the City of New York had no right to deny the Village of Cornwall's application to tap in to the Aqueduct. When the city long ago acquired rights to take water from up-State sources, it did so on condition that it would permit the municipalities along its aqueduct route to be supplied also. It was not accorded the right to pre-empt these up-State sources to the exclusion of the people who lived there and depended upon them for water.

Title K of chapter 51 of the Administrative Code of the City of New York, commonly known as the Water Supply Act, contains the provisions which govern accessibility to the city's aqueduct and reservoir systems. In pertinent part, it reads as follows:

''§ K51-42.0 Water supply to municipalities other than New York City; connections; charges; regulations; quantity to be taken.

'' a. *It shall be lawful* for any of the municipal corporations or water districts in the counties of Ulster, Greene, Delaware, Schoharie, Sullivan, *Orange,* Westchester and Putnam, and for the village of Deposit in the counties of Delaware and Broome, *to take and receive from any* of the reservoirs, aqueducts, conduits * * * and each of * * * [such municipal corporations or water districts] is authorized and empowered to lay the necessary mains, pipes * * * *without the consent* of any board, officer, bureau, or department of the state or any subdivision thereof. * * *

'' d. Any such municipal corporation or water district * * * shall make application to the commissioner * * * [who] shall have exclusive jurisdiction in the premises * * *. *It shall be the duty of the commissioner to grant a permit* or

authorization for such connections, *under reasonable rules and regulations,* including the installation of proper meters or other devices for ascertaining the quantity of water thus taken " (emphasis and bracketed matter added).

The foregoing provisions are merely a re-enactment of the original statute authorizing the city to build the Catskill Aqueduct. That statute, enacted by the Legislature in 1905, provided, in pertinent part, that " immediately upon the acquisition of an additional supply of water by the city * * * it shall be lawful for any of the municipal corporations * * * to take and receive * * * a supply of water * * * for the uses and purposes of the said municipal corporations " (L. 1905, ch. 724, § 40).

It is clear from a reading of these provisions that Cornwall must be granted a " tap-in " permit. The statute is mandatory and no discretion is retained by the appellant commissioner, excepting the promulgation of reasonable rules and regulations attendant thereon. Thus, for example, in analyzing a similar problem concerning a " tap-in " to the Croton Aqueduct system, Mr. Justice NUNEZ held that reasonable regulations concerning the amount of water taken are permissible, " although the permit must issue " (*Village of North Tarrytown* v. *D'Angelo,* N. Y. L. J., March 7, 1968, p. 16, col. 4 [Sup. Ct., N. Y. County]).

The mandatory nature of the statutory provisions emphasizes the intent of the Legislature. The city's potable water dilemma predates the Revolutionary War. When the population of the City of New York rose to 60,000, it was ravaged by a yellow fever epidemic, and the State Legislature, in 1799, chartered the Manhattan Company, the first company formed to alleviate the city's need for potable water. Since that time to the present, an intricate water system has been carved out of the up-State regions of New York State in an attempt to satisfy the ever increasing city needs. Hence, the 1800's witnessed the construction of the old and then the new Croton Aqueduct systems. In the second decade of this century, the Catskill construction followed. This still proved insufficient and an additional system which dammed the Delaware River tributaries and tapped the Delaware watershed sources was created. (See L. White, The Catskill Water Supply of New York City [John Wiley & Sons Inc., 1913 ed.]; see, also, Report of the Special Master, as filed February 2, 1931 with the United States Supreme Court [*New Jersey* v. *New York,* 283 U. S. 336].) The vehicle which facilitated creation of these water systems and alleviated the city's potable water difficulties was the grant by the State to

the city of the right to condemn property in the up-State regions. For many decades, the city extensively used this right of eminent domain. However, the Legislature, in granting the right of condemnation, conditioned it upon a concomitant right of accessibility to the local and pre-empted municipalities (see, also, *Matter of New Rochelle Water Co.*, 39 N. Y. St. Dept. Rep. 82, 85; *Matter of New Rochelle Water Co.*, 75 N. Y. St. Dept. Rep. 291, 293; Richland, Constitutional City Home Rule in New York, 55 Col. L. Rev. 598, 625, n. 212). Once having availed itself of the benefits of the various Water Supply Acts, the city is bound to ensure the Village of Cornwall the co-ordinate benefits granted the village by the very same acts (see, e.g., *Matter of Van Etten* v. *City of New York*, 226 N. Y. 483, 489; *People ex rel. Burhans* v. *City of New York*, 198 N. Y. 439, 446). It would, therefore, directly contravene the legislative intent if the city were now permitted to deny Cornwall accessibility to the Catskill system for reasons not germane to the village's potable water needs and constituting no emergent danger to the Aqueduct system.

The village's "tap-in" application was originally approved by letter dated November 30, 1965, subject to (1) the provisions of the Water Supply Act, (2) approval by the chief engineer of the city's Bureau of Water Supply and (3) the finalization and execution of a formal agreement. The record substantiates that Cornwall has complied with all the provisions of the Water Supply Act. It is also clear that the latter two conditions are ministerial in nature, and there is nothing in this record to indicate that Cornwall has not fulfilled those requirements. After some eight years of construction and the expenditure of more than $1,000,000, the only physical effort remaining is the "cut and cover" operation. It would be grossly unjust to now allow the city to negate Cornwall's vast undertaking, which was performed in reliance upon the city's original permit. There is no doubt that Cornwall acted properly after receiving city approval and changed its position to its detriment. It is also clear that the appellant commissioner's predecessor was acting within his authority when he granted the original permit. The city, therefore, is estopped from "withdrawing" that approval (see, e.g., *City of Hudson* v. *Board of Educ. of City of Hudson*, 158 Misc. 583).

Further, as previously noted, there have been extensive FPC hearings which resulted in a judgment by the United States Court of Appeals. The findings of the FPC are, by statute, conclusive and the judgment of the Circuit Court of Appeals.

upon review, is final, subject only to review by the Supreme Court of the United States (U. S. Code, tit. 16, § 8251). The city may not collaterally attack the final judgment of the Court of Appeals by relitigating the same issues anew. It is immaterial whether we classify this finality as " *res judicata,* estoppel, collateral estoppel, [or] waiver " (*City of Tacoma* v. *Taxpayers of Tacoma,* 357 U. S. 320, 336–337).

The city is dedicated to the proposition that the Storm King project must be stopped and, although so far defeated in many battles to this end, the city still seeks to win the war, by direct or indirect means. Whether the Storm King project should be stopped is not our decision to make. We determine only that the Village of Cornwall has a right to take water from the Catskill Aqueduct and that the city must grant this use under reasonable regulation.

In conclusion, it is clear that the judgment of the Special Term must be affirmed, with costs, and the permit issued, subject only to reasonable rules and regulations upon the remand directed in the judgment. There is no emergent danger to the city in granting Cornwall its right to " tap-in " to the Catskill Aqueduct. The Water Supply Act is mandatory and the circumstances here obtaining dictate strict compliance.

HOPKINS, Acting P. J., MARTUSCELLO, SHAPIRO and BENJAMIN, JJ., concur.

Judgment of the Supreme Court, Orange County, dated October 26, 1973, affirmed, with costs.