HUDSON RIVER FISHERMEN'S ASSOCIATION, Plaintiff,

v.

The CITY OF NEW YORK, Harvey W. Schultz as Commissioner, New York City Department of Environmental Protection, Defendants and Third-party Plaintiffs,

v.

NEW YORK STATE DEPARTMENT OF HEALTH, New York State Disaster Preparedness Commission, and David Axelrod, M.D., as Commissioner, New York State Department of Health and Chairman, New York State Disaster Preparedness Commission, Third-party Defendants.

No. 89 Civ. 2387 (CLB).

United States District Court, S.D. New York.

Nov. 8, 1990.

Robert F. Kennedy, Jr., Natural Resources Defense Council, White Plains, N.Y., for plaintiff.

Robin Levine and Ross Friedman, Law Dept. of the City of New York, New York City, for defendants.

William Caplow, Atty. Gen. of New York, New York City, for third-party defendants.

## MEMORANDUM AND DECISION

BRIEANT, Chief Judge.

On April 11, 1989 the complaint in this action was filed as a "citizen suit" brought under Section 505 of the Clean Water Act 33 U.S.C. § 1365. Plaintiff seeks declaratory and injunctive relief to prevent the unlawful discharge by defendants without a permit, of pollutants into the West Branch Reservoir, a part of the Croton System, one of the three main water supply systems operated by the City of New York. The allegedly unlawful discharge, described in detail below, is claimed to arise from the intermittent emergency operation of the Chelsea Pumping Station at Chelsea, New York, on the east shore of the Hudson River.

The Court has subject matter jurisdiction over the claims set forth in the complaint pursuant to § 505(a)(1) of the Act, 33 U.S.C. § 1365(a)(1). The Croton River, on which the West Branch Reservoir is located, is conceded to be navigable waters of

the State.[1] The statutory notice of violations and the intent to file suit has been complied with, and neither the Environmental Protection Agency (EPA) nor the New York Department of Environmental Conservation (DEC) has elected to commence or prosecute any enforcement action. Venue in this District is appropriate, and the standing of this plaintiff and its members to bring the litigation is not seriously disputed.[2] Members of the Association engage in sport fishing in the Croton River, including the West Branch Reservoir. A member also sells bait and supplies to sport fishermen. Furthermore, the operation of the Chelsea Pumping Station, dependent on the manner and timing of its operation, may have a deleterious effect on fishing conditions in the Hudson River. Were the operations at Chelsea required to obtain a NPDES–SPDES permit,[3] possible conditions of the permit most likely to limit the pollution of the West Branch Reservoir will also be most likely to limit the impact on the Hudson River of the withdrawal of water.

The water supply functions of the City of New York are now supervised and operated by the New York City Department of Environmental Protection, of which defendant Harvey W. Schultz is or was the Commissioner.

On November 30, 1989 the City of New York filed a third party complaint against the State of New York, specifically the State Department of Health, the New York State Disaster Preparedness Commission and David Axelrod, M.D. as Commissioner of the New York State Department of Health and Chairman of the New York State Disaster Preparedness Commission. Essentially, the third party complaint seeks declaratory relief with respect to the operation of the Chelsea Pumping Station in the event that plaintiff were to prevail, thereby subjecting the City to inconsistent di-

rections if it were required to operate the Chelsea Pumping Station in compliance with emergency directives of the State defendants and at the same time were conceivably enjoined by this Court, at the behest of plaintiff, not to do so without an NPDES–SPDES permit.

Fully submitted before this Court are motions for summary judgment by the plaintiff and by the City defendants. The State defendants have taken no position. Although our discussion below, of necessity, makes some assumptions about the merits which are necessary to resolve a complex issue of statutory construction, the Court reminds the reader that this Court is *not* concerned with the propriety or possible adverse environmental effects of the operation of the Chelsea Pumping Station, nor with the appropriateness of the directions made by the State defendants as to when and how it shall be operated; rather this Court is concerned only with the issue of whether the City must apply for an NPDES–SPDES permit and prosecute such application diligently under penalty of having its continued operation of the Chelsea Pumping Station enjoined by this Court for violation of the federal Clean Water Act should it fail to do so.

*The City of New York's Water System*

The relevant facts are complex, but they are not seriously disputed. Our consideration of the matter requires an extensive description of the City of New York's water system and the threatened activities of its managers at the Chelsea Pumping Station.

The people of the City of New York have long enjoyed one of the safest and most reliable public water supply systems in the world. With 300 different locations for monitoring water quality and a distribution network stretching some 6,000 miles, the City's system provides fresh, potable water to more than half of the population of New

---

1. Defs. Ans., ¶ 13.

2. The citizen suit provision of the Clean Water Act, Section 1365(a) of Title 33 of the United States Code provides "... any citizen may commence a civil action on his own behalf ... against any person ... who is alleged to be in

violation of ... an effluent standard or limitation under this chapter...." 33 U.S.C. 1365(a).

3. Defendants admit that they neither sought nor obtained a NPDES–SPDES permit. *Defs. Ans.,* ¶ 41.

York State. Surface water is impounded by the City of New York in three separate up-state reservoir systems; the Croton[4], the Catskill[5] and the Delaware[6] systems. The impounded water flows by gravity through three main aqueduct systems into balancing reservoirs and into the City distribution system. Four feeder tunnels in addition to the aqueducts connect the eighteen reservoirs which make up the New York City supply system. The Croton system supplies approximately ten per cent of the annual water needs of the population served, with the Catskill system providing forty per cent and the Delaware system fifty per cent.[7] The City's water supply system currently provides water for approximately 6.5 million people out of the 7 million people in New York City, and in addition, in compliance with the requirements imposed by the New York State Legislature, serves about 750,000 people in upstate New York.[8]

Municipalities and water districts in the counties of Dutchess, Greene, Orange, Putnam, Schoharie, Ulster and Westchester are entitled to "tap in" to New York City's water supply system at locations approved by the City and receive water at cost pursuant to Title K, Chapter 51 of the Administrative Code of the City of New York, NYC Admin.Code Ch. 51 §§ K51–1.0 et seq., commonly known as the Water Supply Act, passed by the New York State Legislature.

The city's potable water shortage predates the Revolutionary War.[9] Since that

4. The Croton supply was originally developed for Manhattan Island prior to the City consolidation of 1898. Water from the upper Croton System is delivered to the Kensico Reservoir via the Delaware Aqueduct. Water from the lower Croton System flows by gravity through the New Croton Aqueduct to Jerome Park Reservoir and then to the Central Park Reservoir, the original Croton Aqueduct built in the first half of the 19th century having now been abandoned. Water from the lower Croton System can be pumped to the Kensico Reservoir for delivery into the intermediate pressure system. See Temporary State Commission on the Water Supply Needs of Southeastern New York, Local Government Conference 93 (December 1972).

5. The Catskill System consists of two reservoirs and the Catskill Aqueduct. The reservoirs are the Schoharie and the Ashokan. Water is delivered from the Catskill Aqueduct to the Kensico Reservoir. Id.

6. The Delaware System consists of three major supply reservoirs and a collecting reservoir: Cannonsville on the West Branch of the Delaware, Pepacton on the East Branch, Neversink on the Neversink River, a tributary of the Delaware, and Rondout on Rondout Creek, a tributary of the Hudson River. Water is delivered via separate tunnels from Cannonsville, Pepacton, and Neversink to Rondout. From Rondout, the water is delivered via the Delaware Aqueduct to the Kensico Reservoir. Id.

7. Defs. Amended Brief, at 6; Conway Aff. at 3.

8. Defs. Amended Brief, at 5; Conway Aff., at 3.

9. One scholar suggests that New York City's water shortages date back to the time when Peter Minuit purchased Manhattan from the Indians in 1626. C.H. Weidner, Water For A City: A History of New York City's Problem from the Beginning to the Delaware River System 14 (1974). These shortages became more pronounced in the aftermath of the Revolutionary War when New York City, as well as other cities along the Atlantic Coast, recognized the need to develop a water system to address the problems associated with increased urban growth. By the turn of the 19th century, competition between an increasing number of small private water companies only exacerbated the water problems associated with urban growth.

In Manhattan, for instance, the water supply system was operated in part by a corporation, "President and Directors of the Manhattan Company", formed by the legislature on March 30, 1799, by private act, at the instance of Aaron Burr, founder of Tammany Hall and a state assemblyman. Its corporate charter contained banking powers. Although The Manhattan Company did serve about 30,000 people with water piped from a well near the Collect Pond, this and similar statutes proved to be ineffectual because they also enabled the private water companies to use surplus capital on non-water supply transactions, such as banking, rather than requiring that the companies reinvest surplus capital into water supply system improvements. At this same time, New York City began to explore alternative sources of water, including the Bronx River and the Croton watershed.

By the 1830's, New York City faced its most serious water supply crisis to date due to rapid population and industrial growth, as well as changing patterns of both residential and industrial use. And so, in 1834, the State Legislature established a Board of Water Commissioners for the creation of the Croton Aqueduct and a municipally owned water system. New York City went first to the Croton watershed, then to the Catskills and eventually to the Delaware River. See R. Gottlieb, A Life of Its Own: The Politics and Power of Water, 118–121 (1988).

time, an intricate water system has been carved out of the upstate region of New York State in an attempt to satisfy the ever increasing City needs. See *Incorporated Village of Cornwall v. Environmental Protection Admin.*, 45 A.D.2d 297, 358 N.Y.S.2d 459, 463, 464 (2d Dep't 1974). This was facilitated by the grant by the State to the City of the right to condemn real property in the upstate region. The Legislature, in granting the right of condemnation, however, conditioned it upon a concomitant right of accessibility to the water for local and preempted municipalities. *Id.* 358 N.Y.S.2d at 465. Thus, the Water Supply Act permits New York City to expand its water supply system into other counties but requires that the city provide water at cost to the municipalities and water districts within the counties where the city's facilities are located. Hazen and Sawyer, *Delaware–Lower Hudson Region Water Resources Management Study* 5–1 (DEC Publication September 1987).

Because of the dependence on impounded surface water, *i.e.* current rainfall, and because of its large population, the southern New York area is especially vulnerable to the effects of periods of drought. Ancient water mains continuously break and leak, and because of a secular change in the habits of persons using domestic water, per capita usage has increased significantly in the almost half century since the last major extensions to the New York City supply system were initiated.[10]

The "safe yield" of a water system is a term of art which represents the gallons per day which can be produced throughout a twelve month period based upon a presumed reoccurrence of the worst case hydrological conditions on record. *See Temporary State Commission on the Supply Needs of Southeastern New York*, Local Government Conference 101–02 (December 1972). This assumption is essentially somewhat artificial, because the capacity of a reservoir cannot be drawn down to zero, and there is no assurance that the reservoirs would be full of water at the beginning of the period, as is assumed. Nevertheless, the mathematical exercise is a useful one.

If the precipitation patterns of 1964–65, the worst recorded year in more than a century, were to be repeated, the City water supply system could supply its consumers with only 1,290 million gallons of water per day ("mgd"). Current demand, absent conservation measures or rationing, is approximately 1,500 mgd, which is 210 mgd in excess of safe yield.[11]

Prudent management of the New York City water supply must direct itself to an additional source of water supply for the future, in order that safe yield may at least equal current water usage, and also must consider a supplemental source for an emergency.

Beginning in 1929 the City of New York approved a plan for the impoundment and diversion of waters of the Delaware River and its tributaries in New York State to meet the increasing municipal water supply needs of the City and other municipalities dependent on the City. The State of New Jersey began an original suit in the Supreme Court against the State of New York and the City to restrain this proposed diversion, and Pennsylvania intervened to protect its own sovereign interests in the Delaware River. *New Jersey v. New York*, 283 U.S. 336, 51 S.Ct. 478, 75 L.Ed. 1104 (1931). The Supreme Court in that case found the Delaware River and its tributaries "a necessity of life [to] be rationed among those who have power over it," *Id.* at 342, 51 S.Ct. at 479, and applied the

---

**10.** Croton water was first delivered to Manhattan residents on July 4, 1842 followed by great fanfare and celebration. The flush toilet did not become commonly used in New York City until the 1850s. Water shortages recurred regularly thereafter, leading to a continuous expansion of the supply system on the Croton River. Commencing in 1866 construction was begun on the Boyd's Corners Dam in the Town of Kent, Putnam County. Weidner, *supra* note 9, at 61. The work concluded in 1873, after William Marcy Tweed had induced the state legislature to transfer responsibility for the construction to a newly created Department of Public Works of which he was the head.

**11.** Conway Aff., at 3–4.

Federal common law doctrine of equitable apportionment to allow the City to divert from the Delaware watershed up to 440 million gallons of water a day (later increased), provided that certain stream management conditions were met.[12] The Supreme Court retained continuing jurisdiction over its equitable decree in order to adjust the rights of the parties. In one of its revisions to the decree in *New Jersey v. New York* reported at 347 U.S. 995, 1005, 74 S.Ct. 842, 846, 98 L.Ed. 1127 (1954), the Supreme Court held that:

> Any of the parties hereto, complainant, defendants or intervenors may apply at the foot of this decree for other or further action or relief, and this Court retains jurisdiction of the suit for the purpose of any order or direction or modification of this decree, or any supplemental decree that it may deem at any time to be proper in relation to the subject matter of this controversy.

*Id.*

In a prior decision [*Elwood v. City of New York*, 450 F.Supp. 846 (S.D.N.Y.1978) *rev'd. on other grounds sub nom. Badgley v. City of New York*, 606 F.2d 358 (2d Cir.1979) *cert. denied sub nom. Canfield v. City of New York*, 447 U.S. 906, 100 S.Ct. 2989, 64 L.Ed.2d 855 (1980)], this court, relying on the Supreme Court's 1954 decree in *New Jersey*, held that "[t]he City has a continuing equitable duty to develop its available sources of water to meet its increasing needs, by the construction of additional impoundment and storage facilities, and by developing those other sources, including the Hudson River, directly avail-

able to it, and can be required to do so by the Supreme Court." *Id.* at 857.[13]

*The Chelsea Pumping Station and the Hudson River*

This brings us to a consideration of the Chelsea Pumping Station, which is located on the east bank of the Hudson River approximately 65 miles north of New York City.

The City began to seek supplemental and emergency water sources shortly after the Second World War. The most obvious economically feasible new source of water is the Hudson River, and in 1949 the City filed an application with the New York State Water Power and Control Commission[14] seeking permission to pump 100 million gallons per day from the Hudson River at Chelsea on an emergency basis. The permit was granted, subject to compliance with water treatment standards to be set by the New York State Department of Health, and so in 1950–51 the City built a facility known as the Chelsea Pumping Station, at Chelsea, New York in Dutchess County. Except for a brief test run, this facility never saw active service during the 1950's and, as required by its permit, was dismantled in 1957. At that time the City had begun diversion from its new 147 billion gallon Pepacton Reservoir on the East Branch of the Delaware and was in the process of building a new 97 billion gallon reservoir at Cannonsville on the West Branch of that river, and did not expect to use the Chelsea facility in the foreseeable future. But since then the metropolitan region has seen several protracted periods of drought and increased per capita usage, prompting the City not only to reconstruct

---

**12.** It is noteworthy that even though the Supreme Court established the formula for apportioning the resources of the Delaware River, that formula was supplanted by the Delaware River Basin Compact in 1961, Pub.L. No. 87–328, 75 Stat. 688 (1961). In fact, it was the Compact organization, not the courts, which resolved the water allocation problems arising out of the drought of the early 1960's. *See Courts and Water: The Role of the Judicial Process*, Environmental Law Institute Pub. No. 211–974, p. 116 (July 1972).

**13.** The Hudson River repeatedly has been suggested as a source of water supply for the city of New York. For instance, Bradford Seymour, of

Utica, New York, in 1834, outlined plans to build a dam (with navigation locks) across the Hudson River at the foot of Christopher Street in Manhattan to keep salt water from entering the Hudson River thereby creating a new water supply. Weidner, *supra* at note 9, 135, 155.

**14.** The powers of this body, later known as the Water Resources Commission, N.Y.Conser.Law § 410 (McKinney 1967) (repealed by L.1972, c. 664, § 5), are now vested in the New York State Department of Environmental Conservation, N.Y.Envtl.Conserv.Law § 3–0101 (McKinney 1984 & Supp.1990) (L.1972, c. 664, § 2).

but also to use the Chelsea Pumping Station on three particularly severe occasions of shortage in 1966–67, 1984–85 and also on May 1–16, 1989, during the pendency of this lawsuit. *See* Hazen and Sawyer, *supra*, at 5–16.

The Chelsea Pumping Station is located adjacent to Shaft "6" of the Delaware Aqueduct. The Delaware Aqueduct is a deep man-made tunnel which diverts water from the Delaware Reservoir system to the City of New York. In connection with its construction and operation, various numbered vertical access "shafts", as they were called, were established at varying points along the tunnel.

The Chelsea Pumping Station comprises a six foot diameter pipe extending out 700 feet from the shoreline to an intake crib 40 feet below the water level of the Hudson River. Hudson River water is drawn through this pipe into the Chelsea Pumping Station through a series of screens into a wet well. From the wet well, the water is lifted by means of six turbine pumps into Shaft "6" of the Delaware Aqueduct, where it mixes with the Delaware water already flowing through the Aqueduct. In normal operation the Delaware water already in the Delaware Aqueduct typically combines with the Hudson River water from Shaft "6" in a ratio of at least 4:1. This combined flow continues through the Delaware Aqueduct for approximately ten miles to the West Branch Reservoir of the Croton system where all the combined water can be directed up Shaft "9" and into the West Branch Reservoir of the Croton system. This practice is, in fact, followed whenever the Chelsea Pumping Station operates. At other times the City can allow the Delaware water to pass all the way to Kensico in the Delaware Aqueduct, or can divert all or part of it into the West Branch or even into the Croton Reservoir itself.

At Chelsea, pursuant to direction of the New York State Board of Health, the City adds chlorine as a disinfectant sufficient to provide for a chlorine residual of 0.5 milligrams per liter in all of the combined water at the point where it exits Shaft "9" at the West Branch Reservoir. How much chlorine actually must be added at Chelsea to achieve this residual ten miles down the pipe depends, of course, upon a number of things, including water temperature and the biological oxygen demand and other characteristics of the water.

The New York State Board of Health also directs the addition of alum (aluminum sulfate) at Chelsea whenever the turbidity of Hudson River water exceeds a specified level. Accordingly, alum was added to the water pumped through the Chelsea station in 1966, 1985 and 1989.[15] The total amount of alum added to the water on these three occasions was approximately 250 tons.

The quality of the Hudson River water is usually inferior to that of the Croton system. Several communities, however, upstream of Chelsea, are dependent upon Hudson River water throughout the year for their public water supply. The Hudson River is a tidal estuary with a "salt front" of water moving upstream and down, consistent with the tidal current and the amount of fresh water flow present in the river. This tidal current, which flows upstream about half the time and changes direction four times in twenty-four hours, brings salt water from the Atlantic Ocean into the estuary through The Narrows. The progress and location of the "salt front" is affected seasonally by the amount of fresh water passing down the River. Its location also varies between spring and neap tides, and can be changed by several days of strong southerly or northerly wind. Traditionally, the "salt front" was regarded as being at or below Constitution Island, but there is tidal effect in the River as far as the Federal Navigation Lock at Troy, New York and the "salt front" may be at any particular point in the River south of Poughkeepsie at any specific time.

---

**15.** On April 28, 1989, plaintiff sought a temporary restraining order enjoining the operation of the Chelsea pumping station. This Court permitted the pumping to commence, but prohibited treatment of the water with alum pending a hearing. Thereafter, on May 3, 1989, the order was modified on consent to permit treatment of the water with alum pursuant to the conditions set forth in the state-imposed treatment regime.

The Hudson River drains approximately 13,000 square miles, a heavily populated part of the State, and receives residential, agricultural and industrial waste water discharges and run-off of farms, homes and highways. Hudson River water contains a substantial amount of potentially toxic and damaging chemicals and inorganic matter. These include nitrates, sulfates, cadmium, lead, arsenic, zinc, and selenium, usually in levels of concentration acceptable for drinking, together with chlorides, iron and manganese, clay soil in suspension causing turbidity, as well as the usual organic matter, human sewage and other conventional pollutants. Also present in the Hudson River water are organic chemical pesticides, hydrocarbons and volatile organic compounds. As fresh water is removed from the Hudson River without being restored, as in the case of New York City's withdrawals, the remaining water in the River, of necessity, is adversely affected.

Defendants admit that Hudson River water contains "many contaminants that ha[ve] to be removed prior to consumption." Principe Aff. at 4. At the point of its capture, Hudson River water may well be "A" quality water, the second highest rating under the New York Department of Environmental Conversation (DEC) water quality standards. *Id.* Nevertheless, defendants concede that water drawn from the River contains numerous pollutants in concentrations that exceed New York State Department of Health Drinking Standards.

Hudson River water is quite turbid, containing a wide variety of suspended matter such as clay, silt, finely divided organic and inorganic matter, plankton and other microscopic organisms.[16] Such microbiological organisms as bacteria, viruses, plankton and protozoans must be killed and should be removed before the water may be consumed safely. Defendants contend that some of the organic pollutants listed in the affidavit of plaintiff's expert witness, Dr. Raul R. Cardenas—including DDT, polychlorinated biphenyls (PCBs), benzene, and vinyl chloride—either are "not present in

detectable amounts" or are "present at levels far below the levels mandated by state and federal drinking water quality regulations." Principe Aff. at 5. As discussed below, this factual dispute makes little difference in light of defendants' admission that Hudson River water contains many other regulated pollutants at detectable levels.

Notwithstanding the poor quality of Hudson River Water, especially compared to that of the Croton or Delaware system, modern water supply treatment practice can make it safe, good tasting and aesthetic, although at some expense.

Apart from conservation measures, the Chelsea Pumping Station, with its six pumps and 100 mgd capacity, "represents the only currently available, fully operational emergency source of water supply for New York City." Conway Aff. at 4.

As noted earlier, the Chelsea Pumping Station has been used during three different emergency periods since its construction. The facility was operated from March 21, 1966 to January 13, 1967, pumping more than 24 billion gallons from the Hudson River. At that time, the water was treated with very substantial amounts of chlorine in accordance with *ad hoc* New York State Department of Health (DOH) requirements. The pumping station next was activated in 1984–85, pumping 13 billion gallons over a five-month period. This time the State Department of Health required the City to stipulate that it would seek approval for a permanent water supply permit for Chelsea from the State Department of Environmental Conservation. In the interim, the DOH instructed the City to treat Hudson River water with a combination of chlorine and alum, a coagulant the use of which is described below. When the Chelsea facility again was used from May 1, 1989 through May 16, 1989, a final permit had not yet issued, prompting the State Disaster Preparedness Commission under the direction of DOH Commissioner Axelrod to direct treatment of the Hudson

---

16. Much of the turbidity and color of Hudson River water seems to be caused by natural run-off from soil or decayed organic matter, as well as sewage. Principe Aff., at 5.

River water with chlorine and, under certain water conditions, with alum.

*Basic Principles of Water Purification*

Our full understanding of the environmental import of what takes place at the Chelsea Pumping Station when it is being operated requires reference to the basic principles of water purification as presently applied in those communities which must rely on polluted or dirty surface waters. Because "the answer to pollution is dilution" and because of the self-purifying effects on most pathogenic pollution inherent in the air-entraining which occurs in a flowing stream and the settling basin aspects of a lake, the City of New York has been able to limit its treatment of the relatively pristine waters in its reservoir system to the practice of delivering water to the domestic customer with a slight chlorine residual and, until recently at least, has had no need to engage in filtration to meet public health requirements.

Long before the theory that disease was spread by germs had been accepted, water was filtered to purify it. Herodotus reports that Cyrus the Great, King of Persia in the sixth century B.C. carried sterilized water in silver flagons loaded on mule carts to support his army on the march. Typically, modern water treatment plants on the Hudson River depend upon the addition of chlorine to the intake in continued measured amounts, followed by the addition of aluminum sulfate (alum) in the form of finely ground powder dispensed in continuous measured amounts added to turbulent water flowing through a pipe or other channel entering the plant. The chlorine bleaches and oxidizes, thus disinfecting. It reacts with the water to produce dissolved oxygen and at the same time kills micro-organisms and bacteria. The aluminum sulfate, becoming aluminum hydroxide, starts an instantaneous physical reaction with the suspended matter in water. Specifically, the molecules of aluminum hydroxide attract the invisible organic and inorganic particles in the water, including clay in suspension, micro-organisms, small particles of leaves, dirt and other pollutants. These molecules attach to one another and become a precipitant gel or, as it is known to water treatment plant operators, a "floc".[17]

At the same time, the water treatment plant operator may add finely ground lime (calcium carbonate) also as a precipitant and to raise the pH of surface water which in the Northeast tends to be unduly acidic and aggressive and thus likely to corrode mains, pipes and household plumbing. Sodium fluoride is often added to satisfy public health interests, and activated charcoal can be used in small amounts to eliminate tastes and odors. Aeration is often practiced during the process to eliminate tastes and odors as well as some of the hydrocarbons and other volatile organic matter.

The treated water containing the floc may pass through a settling basin where some of the floc settles out, but usually the water will be conveyed to a slow or fast sand filter. Such filters are made according to many different designs, all essentially derived from a bed of sand on top of a bed of gravel, beneath which there are pipes to drain the filter. In passing through the sand filtration the floc is filtered out by sticking to the pieces of sand, as are microbes and all other unwelcome materials subject to mechanical removal. Clear, pure water emerges at the bottom of the sand filter, generally free of color and turbidity as well as having had the micro-organisms and bacteria killed and mechanically removed. Periodically, all sand filters are "backwashed" by reversing the flow and allowing the mud and floc caught by the filter to be washed out of the sand so that filter efficiency can be restored.

There are alternative procedures available in which mechanical filtration or closed pressure patent filters of various kinds are used, but the water treatment process described, issuing from the patent granted to James Peacock in England in 1791, is essentially unchanged today. Wa-

17. The word "floc" is derived from the Latin "floccus", a tuft or lock of wool, and describes a "very fine fluffy mass formed by the aggrega- tion of fine suspended particles." Websters New Twentieth Century Dictionary (2d ed. 1979).

ter purification depends, essentially, as it has for more than two centuries, on pre-sedimentation, disinfection, coagulation and sand filtration.

The practice of sand filtration is ancient. It was used in the early years of the textile industry in England to remove the mud from water used in a bleachery. The practice of sand filtration began in American public water supplies at Richmond, Virginia in 1832. The City of Poughkeepsie began sand filtration of Hudson River water in 1872.[18]

Coagulation by alum is said to have been developed first by the Chinese dependent on the waters of the Yellow River. However, the use of coagulation by alum on a public water supply in America did not begin until 1885 with the Somerville & Raritan Water Company of New Jersey. There, as today almost without exception, the use of alum as a coagulant was followed with sand filtration to remove the resulting floc. However, at Omaha, Nebraska in 1889 coagulation by alum was used without filtration and the resulting floc was simply allowed to settle in basins before the water was pumped into the system.

Essentially, this is what the City of New York is doing at Chelsea, using the West Branch Reservoir as one giant settling basin for the resulting floc. When allowed to settle long enough, the floc loses its woolly character and becomes a slightly alkaline, heavy alum sludge containing alum, clay and silt, dead micro-organisms, bacteria, chlorides and other items not welcome in the bed of a clean mountain lake.

Disinfection by chlorine as a water supply technique began in 1908 at the Boonton Reservoir of the Jersey City Water Works. Chloride of lime had been added to London sewage in the mid 19th century to control odors, but the Boonton application derived from promotions of various experimental methods of treating sewage by electrocution, proposed near the end of the last century in the United States.[19]

The first American patent for chlorination of public drinking water was granted on May 22, 1888 to Albert R. Leeds, Professor of Chemistry at Stephens Institute of Technology, Hoboken, New Jersey. In 1893, New York City installed an experimental "electrozone" plant, producing "electrozone" from salt brine by electricity on the East Branch of the Croton River to treat the sewage discharge of the Village of Brewster where it enters the New York City water supply. This plant continued in operation until it was destroyed by fire in 1911.[20] The "electrozone" process was found to have sterilized the sewage and to have induced sedimentation, removed taste and odor due to decomposition of organic matter, and to have "decolorized" the water. Ultimately, Professor Thomas F. Drown in 1894 determined that "the so-called electrical purification of water by treating it with an electrolyzed solution of salt is thus seen to be simply a process of disinfection by sodium hydrochloride; electricity as such has nothing to do with it". As noted earlier, this discovery was not applied in the field until 1908 at Boonton. It is now almost universally used.

The floc and other precipitated material removed from the top of the sand filters during backwash contains organic matter as well as various aluminum compounds and some chlorine residual. Becoming alum sludge, it is regarded as a regulated pollutant requiring a NPDES–SPDES permit for its disposition. Indeed, several water treatment plants which have been discharging their alum sludge and backwash containing chlorine residual into the Hudson River or its tributaries have been

**18.** *See* M.N. Baker, *The Quest for Pure Water* (1948) (also relied on elsewhere in the text).

**19.** The Pope & Sawyer United States patent of May 7, 1873 discloses the invention of passing electric current through metallic wire arranged in horizontal coils in water, and thus seeking to precipitate any substance in solution. Webster's United States patent of 1887 for methods of purifying sewage by electrolysis mentions use of the invention also in connection with filters for purifying drinking water. *See* Quest, *supra.*

**20.** Thereafter, bleaching powder or chloride of lime, and later liquid chlorine under pressure, were used to treat the Brewster sewage.

**1098**

placed under consent orders by the DEC to stop this practice.[21]

Similarly, the discharge of chlorine from a point source is regarded as the discharge of a regulated pollutant. The City of New York operates several sewage treatment plants on the Croton River system, the effluent of which is discharged into the Croton watershed containing a chlorine residual. Those discharges are the subject of NPDES–SPDES permits authorizing and regulating their discharge.

I have described the operation of a typical water treatment plant using Hudson River water in some detail because of a need to contrast it with what occurs at Chelsea. At Chelsea the City adds chlorine in substantial but varying amounts, so as to achieve a 0.5 mg. per liter residual in all the water ten miles down the pipe at the West Branch Reservoir.

The reaction or process by which the aluminum sulfate added at Shaft "6" creates floc coagulation, commences immediately and continues during the passage of the water from Shaft "6" to Shaft "9". However, unlike the typical water treatment plant, instead of filtering the floc from the water, the City uses the West Branch Reservoir as a giant settling basin. This means that the floc and the pollutants with which the alum has coagulated descend to the bottom of the reservoir where they are likely to remain for the indefinite future. The chlorine residual also enters the West Branch Reservoir where it ultimately dissipates.

In 1985, when perhaps unreasonably large amounts of alum were applied to the water at Chelsea, plaintiffs claim that approximately 1,300 tons of alum sludge settled out at the bottom of the West Branch Reservoir, on top of approximately a foot of sludge placed there in 1966–67, covering 26 acres or more.[22] The Court need not adopt these factual contentions, which are disputed, but it is inescapable that a significant, and indeed a substantial amount of alum sludge has been settled or precipitated on the bottom of the West Branch Reservoir. So long as the existing method of operation continues, without sand filtration at Chelsea, there is likely to be a lot more.

The introduction of this alum sludge can have potentially damaging effects on the waters and fish in the West Branch Reservoir. Any sludge deposited at the bottom of a lake tends to damage the eco-system at which the aquatic food chain begins. The alum itself may increase the pH of the sediment at the bottom of the lake and the alum sludge will block light and access of dissolved nutrients and oxygen to those living plants and organisms, ordinarily present at the bottom of an unpolluted lake. Together with the alum will be precipitated various heavy metals, organic compounds and micro-organisms living and dead, found in the Hudson River but not regularly found in the West Branch Reservoir. Whatever adverse environmental conditions this alum sludge may cause will continue long after any emergency activation of the Chelsea Pumping Station has ceased. Ionic aluminum, which will be present in the sludge, is listed as a regulated pollutant for which discharge standards have been established under the state's NPDES/SPDES program. *See* 6 NYCRR Part 701, App. 31. Aluminum can, in adequate concentrations, be toxic to aquatic life. We reiterate that our concern is not whether a permit should be granted or what the terms and conditions of a permit should be, but rather whether a permit is required. However, considering the purpose of the statute, what is taking place at West Branch Reservoir is exactly the sort of damaging pollution which was intended to be regulated under the Clean Water Act. *See* 1972 U.S.Code Cong. & Admin.News 3668, 3678.

Plaintiff alleges that various discharges associated with the emergency operation of the Chelsea Pumping Station violate the Federal Clean Water Act, 33 U.S.C. § 1251 *et seq.* (1987) ("CWA"). Plaintiff alleges that defendants have acted unlawfully by

**21.** Cardenas Aff., ¶ 24, Appendix F. The preferred method of disposing of alum sludge is for it to be dried and placed in a landfill.

**22.** Cardenas Aff., ¶ 25.

discharging chlorine and alum—chemicals toxic in excessive amounts but commonly used to disinfect and clarify drinking water—without first obtaining a pollution emissions permit in accordance with the CWA. In addition, plaintiff argues that defendants should have sought an emissions permit before discharging "dirty" Hudson River water into a pristine reservoir because such water, quite apart from the purifying chemicals later added to it, constitutes a "pollutant" under the Act.

Plaintiff seeks (i) a declaratory judgment that the City's discharges into the West Branch Reservoir violated Section 301 of the Clean Water Act, 33 U.S.C. § 1311, (ii) an order enjoining all future discharges except those pursuant to a federal or state emissions permit, and (iii) an award of such civil penalties and costs (including attorneys' fees) as the Court deems appropriate after a further hearing on the issue of penalties.

The City defendants argue that (i) the CWA is preempted by the highly specific requirements of the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.* (1987) ("SDWA"), (ii) beneficial chemicals like chlorine and alum do not fall within the CWA's definition of "pollutants," and (iii) the New York Department of Conservation's ("DEC's") determination that defendants' discharges do not require an emissions permit is entitled to great deference.

As noted earlier, instructed by the Department of Health in 1984, the City has petitioned the state DEC for a permanent water supply permit for Chelsea pursuant to Article 15 of Title 15 of the New York Environmental Conservation Law. In its application, the City has sought permission to reactivate the Chelsea Station as a matter of course when needed. To prevail, the City must show that its treatment of Hudson River water satisfies the Federal Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.* ("SDWA"). Defendants emphasize that these proceedings before an Administrative Law Judge not only have "ad-

dressed such factors as ... impacts on aquatic life in the reservoir and in the Hudson River" but also have involved active participation by plaintiff and other environmental organizations. Defendants contend that the New York State DEC, exercising its scientific expertise, has decided to address *all* of the environmental issues posed by the Chelsea Pumping Station within the context of granting or denying a water supply permit.

 This interpretation of the DEC's position is unfounded. The DEC lacks the power to give the City a *de facto* exemption from the permit procedures of the Federal Clean Water Act otherwise applicable to it. *See Natural Resources Defense Council v. Costle*, 568 F.2d 1369, 1374 (D.C.Cir.1977) (the Administrator of the EPA lacks the statutory authority to exempt entire classes of "point sources" just because they represent insignificant sources of pollution or are not amenable to numeric effluent standards). Moreover, the City's ongoing SDWA proceedings have nothing whatever to do with the discharge of pollutants, and obtaining a permit under the state statute does not abrogate the need for a federal permit under the Clean Water Act; if anything, these proceedings will tend to discount any environmental harm to the West Branch Reservoir in favor of more thorough chlorination in the interests of public health.

 One principle of statutory construction advanced by defendants is that the Safe Drinking Water Act, 42 U.S.C. §§ 300f *et seq.*, preempts by implication the Clean Water Act, 33 U.S.C. § 1251 *et seq.* because the former Act was adopted after the later Act. Absent an express Congressional statement to the contrary, this court concludes that the Safe Drinking Water Act cannot be interpreted to deprive plaintiff of its statutory right under the Clean Water Act.[23]

The Federal Clean Water Act was enacted in 1972 "to restore and maintain the chemical, physical and biological integrity

---

23. The DEC also rejects defendants' contention that the Clean Water Act is preempted by the

Safe Drinking Water Act. Pagano Aff., at 1.

of the Nation's waters." 33 U.S.C. § 1251(a). At the time of its passage, Congress hoped to eliminate the discharge of all pollutants into navigable waters by 1985. 33 U.S.C. § 1251(a)(1); *Costle, supra*, 568 F.2d at 1373. At the center of this regulatory effort was the National Pollution Discharge Elimination System (NPDES), 33 U.S.C. § 1311, which made all discharges of pollutants from point sources unlawful except in conformity with a permit issued by the EPA or a state with an approved NPDES program. "Discharge of a pollutant" is defined as "any addition of any pollutant to navigable waters from any point source." 33 U.S.C. § 1362(12).

State permit programs, known as SPDES programs, were required to be at least as restrictive as the EPA's emissions standards. 33 U.S.C. § 1342. In addition, individual states were encouraged to develop and enforce still more strict criteria. New York's NPDES/SPDES program received the approval of the Administrator of the Environmental Protection Agency in 1973.

Two years after the passage of the Clean Water Act, Congress adopted the Safe Drinking Water Act "to assure that water supply systems serving the public meet minimum national standards for protection of public health." 1974 U.S.Code Cong. Admin.News 6454. This enactment authorized the EPA to establish Federal standards which standards would be applicable to all public water systems and to establish a joint Federal–State system for assuring compliance with these standards and for protecting underground sources of drinking water.

Clearly, the Safe Drinking Water Act does not provide adequate justification for ignoring the express and unambiguous directive of the previously adopted Clean Water Act. The objective of the Clean Water Act is to preserve the environmental integrity of navigable waters, while the objective of the Safe Drinking Water Act is to prescribe minimum national standards concerning the purity of drinking water for the protection of the public health. Neither of these objectives are mutually exclusive. Nor are the directions of Congress with respect to these objectives in conflict as defendant suggests. Rather, the two objectives are complementary.[24] By filtration at Chelsea, this drinking water may be made safe in compliance with the Safe Drinking Water Act, by means which comport with the NPDES/SPDES requirements of the Clean Water Act and avoid pollution of the West Branch Reservoir or the Croton River.

This conclusion is also consistent with the new Supreme Court standard of literalism with respect to the pre-emptive effect of remedial legislation. As the Court stated in *United States v. Fausto*, 484 U.S. 439, 108 S.Ct. 668, 98 L.Ed.2d 830 (1988), "it can be strongly presumed that Congress will specifically address language on the statute books that it wishes to change." *Id.* at 453, 108 S.Ct. at 676. Accordingly where "two statutes are capable of coexistence, it is the duty of the court, absent a clearly expressed congressional intent to the contrary, to regard each as effective." *Morton v. Mancari*, 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984).

Finally, it is noteworthy that the Clean Water Act has been amended five times since it was first enacted and underwent major revisions in 1987.[25] If Congress wished to provide additional exemptions from the permit procedures of the Clean Water Act, it had an excellent opportunity to do just that when it made its most recent revisions in 1988. It did not.

---

**24.** For example, the Clean Water Act seeks to reduce turbidity to protect aquatic life, while the Safe Drinking Water Act seeks to reduce turbidity for reasons of health and aesthetics.

**25.** The Clean Water Act was amended on December 27, 1977, December 29, 1981, January 8, 1983, February 4, 1987 and November 18, 1988. The Safe Drinking Water Act was revised twice since 1974, namely on June 19, 1986 and on October 31, 1988. The last amendments to the two Acts were only 19 days apart, with the Clean Water Act amendments being the most recent. Thus, defendants' assertion that the Safe Drinking Water Act pre-empts by implication the Clean Water Act is not supported by the chronology.

■ It seems clear on the uncontested facts of this case, that the City of New York has a duty to apply for an NPDES–SPDES permit for addition of pollutants to the navigable waters of the West Branch Reservoir from a point source within the definition of the Clean Water Act. See 33 U.S.C. § 1362(12). The permit requirement lies at the center of this legislation and makes all discharges of pollutants from point sources into the navigable waters unlawful except in conformity with a permit issued either by the EPA or a State with an approved permit system. The statute and the Code of Federal Regulations impose extensive requirements for a permit application, including provisions for managing the discharge and determining permissible discharge levels, following a public hearing. The statute literally extends to the conduct of the City in connection with its operations of the Chelsea Pumping Station. That Station has operated in the recent past, and the City is under direction and also under practical necessity to operate it again in the future as soon as need for the water becomes apparent. Indeed, there is reason to believe that operating the Chelsea Pumping Station would be less damaging environmentally, ·both to the West Branch Reservoir and the Hudson River itself, if it were to take place in advance of need at a time when fresh water flows in the Hudson River are higher, and therefore cleaner, so presumably less alum coagulant would be required.

There is no reason not to apply the statute literally in this case. Section 502(14) defines "point source" as "any discernible, confined and discrete conveyance, including but not limited to any pipe ... from which pollutants are or may be discharged." 33 U.S.C. § 1362(14).[26] It is quite clear that a pipe, however large, is a point source, and the Delaware aqueduct is a pipe and Shaft "9" where it discharges into the West Branch Reservoir is also a pipe.

"Pollutant" is defined by the Clean Water Act, Section 502(6) as "dredged spoil, solid waste, incinerator residue, sewage, garbage, sewage sludge, munitions, chemical wastes, biological materials, radioactive materials, heat, wrecked or discarded equipment, rock, sand, cellar dirt and industrial, municipal, and agricultural waste, discharged into water." 33 U.S.C. § 1362(6). Relying on the underlying goal of the Clean Water Act, the Courts have read the definition of "pollutant" to encompass substances not specifically enumerated but subsumed under the broad generic terms such as "chemical waste" and "solid waste". For instance, in *United States v. Hamel*, 551 F.2d 107 (6th Cir.1977), the Sixth Circuit Court of Appeals affirmed a lower court ruling that petroleum products are "pollutants" subsumed under the broad term chemical waste within the meaning of the Clean Water Act, despite the fact that Congress did not list by name oil and oil products within the definition of pollutant.

It is indisputable that a pollutant is a pollutant no matter how useful it may earlier have been.[27] Clearly, a chlorine residual, when discharged into navigable waters is regarded as a pollutant, even though its intended use is a beneficial one. Indeed it is, because chlorine inhibits much of the life in the aquatic food chain and can even kill fish eggs or small fish at certain times of the year and at certain concentrations. In fact, the EPA, the agency charged with

---

**26.** One of the oft-cited examples of how loosely the courts have interpreted the definition of "point source" is the Supreme Court's decision in *Weinberger v. Romero–Barcelo,* 456 U.S. 305, 307–08, 102 S.Ct. 1798, 1800–01, 72 L.Ed.2d 91 (1982), upholding a district court decision that airplanes accidentally or deliberately dropping bombs into the sea, as well as ships firing at marine targets, are "point sources" within the meaning of the Clean Water Act.

**27.** *See Minnehaha Creek Watershed District v. Hoffman,* 597 F.2d 617, 627 (8th Cir.1979) ("no justification in the act for the ... determination that whether the discharge of a particular substance listed in § 502(6) constitutes the discharge of a 'pollutant' ... depends upon the purpose for which the discharge is made"); *United States v. Fort Pierre,* 580 F.Supp. 1036, 1041 (D.S.D.1983), *rev'd on other grounds,* 747 F.2d 464 (8th Cir.1984) ("[t]he City's actions violated the strict liability Clean Water Act, the motive of the City is, in law, immaterial"); *United States v. Ballard Oil Co., Inc.,* 195 F.2d 369 (2d Cir.1952) (Judge Learned Hand interpreting the Refuse Act, the predecessor statute to the Clean Water Act).

the administration and enforcement of the Federal Clean Water Act, in its published regulations and guidelines cites chlorine as an example of a "pollutant." *See* 49 Fed. Reg. 37998, 38028 (1984).

This Court is also convinced that the alum sludge or the floc is a pollutant. As noted earlier, floc would be considered waste in a normal water treatment facility and, as such would be filtered out, backwashed from the filter, and disposed of as waste. As defendants conceded at oral argument, what occurs at the Chelsea Pumping Station is the same as what occurs at any other water treatment plant, except that most water plants which use alum dispose of the precipitated floc as a waste product when the filter is backwashed or the settling basins are cleaned. The physical reaction which creates the floc, that is the coagulation and precipitation function for which the alum is added, starts taking place immediately and is probably largely concluded by the time the water is discharged from the "pipe" and enters the West Branch Reservoir. All that remains to happen is for the floc to settle out at the bottom of the lake. Thus, this court concludes that the alum starts to be a waste product and a pollutant from the minute it is injected into the river water and that the resulting floc is a chemical waste and a pollutant when it arrives at the West Branch Reservoir. As with chlorine, the EPA has indicated that "raw water clarifier sludges and filter backwash, if discharged, [to a watershed] are subject to NPDES permit regulations as are any other discharges of pollutants." *Id.* at 38028.

A greater degree of doubtfulness attaches to the contention of plaintiff that somehow by taking the dirty water of the Hudson River and discharging it into the pristine waters of the Croton system a pollutant has been added from a point source. Probably as soon as the floc settles out, the water entering West Branch Reservoir is of a quality as good or better than the water already present in the Cro-

ton system. However, it is unnecessary to resolve the issue to decide this case.

■ The next contention advanced by defendants is that the contaminants complained of are not "add[ed]" to navigable waters by defendants, within the meaning of the Clean Water Act. Relying on *National Wildlife Federation v. Gorsuch,* 693 F.2d 156 (D.C.Cir.1982) and *National Wildlife Federation v. Consumers Power Co.,* 862 F.2d 580 (6th Cir.1988), defendants allege that the transfer of chemicals from the Hudson River into the West Branch Reservoir is not the "addition of any pollutant" because any such chemicals were in the Hudson River prior to and independent of the operation of the Chelsea Pumping Station.

In *Gorsuch,* the District of Columbia Circuit addressed the issue of whether dam induced water quality changes are "addition[s]" that trigger the NPDES permit requirement. 693 F.2d at 164. That court held that no permit was required since a pollutant was not physically introduced "into the water from the outside world." *Id.* at 175. A similar conclusion was reached in *Consumers Power Co.* when the Sixth Circuit held that a hydro-electric facility's movement of pollutants already in the water did not amount to an "addition of pollutants" so as to require a NPDES permit. 862 F.2d 580.

Here, however, defendants are adding chlorine and alum to the water with the intention of creating a partly chemical, partly physical reaction. It cannot be seriously disputed that chlorine, alum and the resulting floc are physically introduced into the water of the West Branch Reservoir and the Croton River from the outside.

■ Finally, defendants suggest that this court must give great deference to the interpretation of the Clean Water Act given by the officers or agency charged with its administration. What this otherwise valid argument overlooks, however, is that it is the EPA, in the first instance, and not the DEC that is charged with the administration of the Federal Clean Water Act.[28]

---

**28.** Section 1251(d) of Title 33 of the United States Code provides:

Except as otherwise provided in this chapter, the Administrator of the Environmental Pro-

And since the EPA's conclusion that chlorine, alum and alum sludge are pollutants is "sufficiently reasonable" and consistent with the language of the Clean Water Act, its construction must be upheld by this court. *National Wildlife Federation v. Gorsuch,* 693 F.2d 156, 170–71 (D.C.Cir. 1982) (citations omitted).

Defendants rely on the affidavit of Salvatore Pagano, the Director of the Division of Water for the DEC, who states: "In my opinion, under the facts presented herein, chlorine and alum do not fall within the term 'chemical waste', nor within any other enumerated category in the definition of pollutant." [29] This Court is not bound by the *ad hoc* determinations of a lone DEC employee opining without the benefit of promulgated regulations or guidelines, especially where, as here, there has been no public notice and/or an opportunity for a public hearing. *See Ford Motor Co. v. United States Environmental Protection Agency,* 567 F.2d 661, 671–72 (6th Cir. 1977). Nor is this Court bound by the DEC's declaratory ruling in *In re Richard Booth,*[30] wherein the DEC was concerned with the issue of whether a chemical pesticide used to control noxious fish species was a "pollutant" within the meaning of Section 17–0105.17 of the New York State's Water Pollution Control Act, N.Y.Envtl. Conserv.Law § 17–0105.17 (McKinney 1984 & Supp.1990).

Accordingly, this Court concludes that defendants violated Section 301 of the Clean Water Act, 33 U.S.C. § 1311, by discharging chlorine and alum floc into the West Branch Reservoir without first obtaining a pollution emissions permit, and that it threatens to do so again in the foreseeable future if another water shortage occurs. Plaintiff's motion for summary judgment is granted and defendants motion is denied.

Within thirty (30) days of appellate finality of a declaratory judgment to that effect in this case, defendant City of New York must apply for an NPDES–SPDES permit and prosecute such application diligently under penalty of having its continued operation of the Chelsea Pumping Station enjoined by this Court. Should it fail to do so, or if such permit is denied, plaintiff thereafter shall be entitled, upon further application to this Court on notice, to injunctive relief against violation of the federal Clean Water Act.

This Court reserves jurisdiction also for the limited purposes of (1) computing civil penalties and/or costs and legal fees; and (2) enjoining any future operation of the Chelsea Pumping Station by defendants, should it be necessary to do so.

There is no just cause for delay. *See* Rule 54(b) F.R.Civ.P. In the interests of justice and to avoid costly and unnecessary procedures in fixing penalties, costs and fees prior to appellate finality on the substantive issue of liability, the Court directs entry of a declaratory judgment at this time consistent with this decision.

Settle judgment on waiver of notice of settlement or ten (10) days notice of settlement.

---

tection Agency ... shall administer this chapter.
33 U.S.C. § 1251(d).
Even though the Clean Water Act provides for the transfer of Federal program authority to the states to conduct NPDES permit compliance monitoring, the EPA still retains its residual enforcement authority and may oppose the state's granting of a permit. 33 U.S.C. § 1342(d)(2). "Congress provided that even when the EPA vested a state with permitting authority it should retain a measure of control." *National Resources Defense Council, Inc. v. United States Environmental Protection Agency,* 859 F.2d 156, 181 (D.C.Cir.1988).

**29.** Pagano Aff., p. 3, ¶ 15.

**30.** Pagano Aff., Exhibit C.