## NEW JERSEY *v.* NEW YORK ET AL.

No. 16, original. Argued April 13, 14, 15, 1931.—Decided May 4, 1931.

338

See 280 U. S. 528, 533; *post*, p. 805.

*Messrs. Duane E. Minard,* Assistant Attorney General of New Jersey, and *James M. Beck,* with whom *Messrs. William A. Stevens,* Attorney General, and *George S. Hobart* were on the brief, for plaintiff.

*Mr. Thomas Penney, Jr.,* Special Assistant Attorney General of New York, with whom *Mr. John J. Bennett, Jr.,* Attorney General, was on the brief, for the defendant State of New York.

340

Mr. *Arthur J. W. Hilly*, Corporation Counsel of the City of New York, with whom *Messrs. J. Joseph Lilly, Frank H. Deal, Frank J. Coyle*, and *David C. Broderick* were on the brief, for defendant City of New York.

Mr. *George G. Chandler*, with whom Mr. *William A. Schnader*, Attorney General of Pennsylvania, was on the brief, for the Commonwealth of Pennsylvania, intervener.

MR. JUSTICE HOLMES delivered the opinion of the Court.

This is a bill in equity by which the State of New Jersey seeks to enjoin the State of New York and the City of New York from diverting any waters from the Delaware River or its tributaries, and particularly from the Neversink River, Willowemoc River, Beaver Kill, East Branch of the Delaware River and Little Delaware River, or from any part of any one of them. The other rivers named are among the headwaters of the Delaware and flow into it where it forms a boundary between New York and Pennsylvania. The Delaware continues its course as such boundary to Tristate Rock, near Port Jervis in New York, at which point Pennsylvania and New York

are met by New Jersey. From there the River marks the boundary between Pennsylvania and New Jersey until Pennsylvania stops at the Delaware state line, and from then on the river divides Delaware from New Jersey until it reaches the Atlantic between Cape Henlopen and Cape May.

New York proposes to divert a large amount of water from the above-named tributaries of the Delaware and from the watershed of that river to the watershed of the Hudson River in order to increase the water supply of the City of New York. New Jersey insists on a strict application of the rules of the common law governing private riparian proprietors subject to the same sovereign power. Pennsylvania intervenes to protect its interests as against anything that might be done to prejudice its future needs.

We are met at the outset by the question what rule is to be applied. It is established that a more liberal answer may be given than in a controversy between neighbors members of a single State. *Connecticut* v. *Massachusetts*, 282 U. S. 660. Different considerations come in when we are dealing with independent sovereigns having to regard the welfare of the whole population and when the alternative to settlement is war. In a less degree, perhaps, the same is true of the quasi-sovereignties bound together in the Union. A river is more than an amenity, it is a treasure. It offers a necessity of life that must be rationed among those who have power over it. New York has the physical power to cut off all the water within its jurisdiction. But clearly the exercise of such a power to the destruction of the interest of lower States could not be tolerated. And on the other hand equally little could New Jersey be permitted to require New York to give up its power altogether in order that the River might come down to it undiminished. Both States have real and substantial interests in the River that must be reconciled

as best they may be. The different traditions and practices in different parts of the country may lead to varying results, but the effort always is to secure an equitable apportionment without quibbling over formulas. See *Missouri* v. *Illinois,* 200 U. S. 496, 520. *Kansas* v. *Colorado,* 206 U. S. 46, 98, 117. *Georgia* v. *Tennessee Copper Co.,* 206 U. S. 230, 237. *Wyoming* v. *Colorado,* 259 U. S. 419, 465, 470. *Connecticut* v. *Massachusetts,* 282 U. S. 660, 670.

This case was referred to a Master and a great mass of evidence was taken. In a most competent and excellent report the Master adopted the principle of equitable division which clearly results from the decisions of the last quarter of a century. Where that principle is established there is not much left to discuss. The removal of water to a different watershed obviously must be allowed at times unless States are to be deprived of the most beneficial use on formal grounds. In fact it has been allowed repeatedly and has been practiced by the States concerned. *Missouri* v. *Illinois,* 200 U. S. 496, 526. *Wyoming* v. *Colorado,* 259 U. S. 419, 466. *Connecticut* v. *Massachusetts,* 282 U. S. 660, 671.

New Jersey alleges that the proposed diversion will transgress its rights in many respects. That it will interfere with the navigability of the Delaware without the authority of Congress or the Secretary of War. That it will deprive the State and its citizens who are riparian owners of the undiminished flow of the stream to which they are entitled by the common law as adopted by both States. That it will injuriously affect water power and the ability to develop it. That it will injuriously affect the sanitary conditions of the River. That it will do the same to the industrial use of it. That it will increase the salinity of the lower part of the River and of Delaware Bay to the injury of the oyster industry there. That it will injure the shad fisheries. That it will do the

same to the municipal water supply of the New Jersey towns and cities on the River. That by lowering the level of the water it will injure the cultivation of adjoining lands; and finally, that it will injuriously affect the River for recreational purposes. The bill also complains of the change of watershed, already disposed of; denies the necessity of the diversion; charges extravagant use of present supplies, and alleges that the plan will violate the Federal Water Power Act, (but see U. S. Code, Tit. 16, § 821,) interfere with interstate commerce, prefer the ports of New York to those of New Jersey and will take the property of New Jersey and its citizens without due process of law.

The Master finds that the above-named tributaries of the Delaware are not navigable waters of the United States at and above the places where the City of New York proposes to erect dams. Assuming that relief by injunction still might be proper if a substantial diminution within the limits of navigability was threatened, *United States* v. *Rio Grande Dam & Irrigation Co.*, 174 U. S. 690, 709, he called as a witness General George B. Pillsbury, Assistant Chief of Engineers of the United States Army, who was well acquainted with the River and the plan, and who, although not speaking officially for the War Department, satisfied the Master's mind that the navigable capacity of the River would not be impaired. Of course in that particular as in some others New York takes the risk of the future. If the War Department should in future change its present disinclination to interfere, New York would have to yield to its decision, and the possible experiences of the future may make modifications of the plan as it now stands necessary in unforeseen particulars. This will be provided for in the decree. Subject to these considerations and to what remains to be said the New York plan as qualified here is reasonably necessary. Some plan must be formed and soon acted upon,

and taking into account the superior quality of the water and the other advantages of the proposed site over others, it at least is not arbitrary or beyond the freedom of choice that must be left to New York.

With regard to water power the Master concludes that any future plan. of New Jersey for constructing dams would need the consent of Congress and of the States of New York and Pennsylvania and, though possible as a matter of engineering, probably would not pay. He adds that there is no such showing of a present interest as to entitle New Jersey to relief. *New York* v. *Illinois*, 274 U. S. 488, 490. *New Jersey* v. *Sargent*, 269 U. S. 328. We have spoken at the outset of the more general qualifications of New Jersey's rights as against another State. The Master finds that the taking of 600 millions of gallons daily from the tributaries will not materially affect the River or its sanitary condition, or as a source of municipal water supply, or for industrial uses, or for agriculture, or for the fisheries for shad. The effect upon the use for recreation and upon its reputation in that regard will be somewhat more serious, as will be the effect of increased salinity of the River upon the oyster fisheries. The total is found to be greater than New Jersey ought to bear, but the damage can be removed by reducing the draft of New York to 440 million gallons daily; constructing an efficient plant for the treatment of sewage entering the Delaware or Neversink (the main source of present pollution,) thereby reducing the organic impurities 85%, and treating the effluent with a germicide so as to reduce the Bacillus Coli originally present in the sewage by 90%; and finally, subject to the qualifications in the decree, when the stage of the Delaware falls below .50 c. s. m. at Port Jervis, New York, or Trenton, New Jersey, by releasing water from the impounding reservoirs of New York, sufficient to restore the flow at those points to .50 c. s. m. We are of opinion that the Master's report should

be confirmed and that a decree should be entered to the following effect, subject to such modifications as may be ordered by the Court hereafter.

1. The injunction prayed for by New Jersey so far as it would restrain the State of New York or City of New York from diverting from the Delaware River or its tributaries to the New York City water supply the equivalent of 440 million gallons of water daily is denied, but is granted to restrain the said State and City from diverting water in excess of that amount. The denial of the injunction as above is subject to the following conditions.

(a) Before any diversion shall be made an efficient plant for the treatment of sewage at Port Jervis, New York, shall be constructed and the sewage of Port Jervis entering the Delaware or Neversink Rivers shall be treated to such an extent as to effect a reduction of 85% in the organic impurities. And the effluent from such plant shall be treated with a chemical germicide, or otherwise, so that the B. coli originally present in the sewage shall be reduced by 90%.

Untreated industrial waste from plants in said town of Port Jervis shall not be allowed to enter the Delaware or Neversink Rivers, and the treatment of such industrial wastes shall be such as to render the effluent practically free from suspended matter and non-putrescent; and said treatment of sewage and industrial waste shall be maintained so long as any diversion is made from the Delaware River or its tributaries.

(b) At any time the stage of the Delaware River falls below .50 c. s. m. at Port Jervis, New York, or Trenton, New Jersey, or both (.50 c. s. m. being equivalent to a flow of 1535 c. f. s. at Port Jervis and 3400 c. f. s. at Trenton), water shall be released from one or more of the impounding reservoirs of New York City in sufficient volume to restore the flow at Port Jervis and Trenton to .50

c. s. m., provided, however, that there is not required to be released at any time water in excess of 30% of the diversion area yield, and the diversion area yield having been ascertained to be 2.2 c. s. m., the maximum release required shall be 30% of that amount, or .66 cubic feet per second per square mile of the areas from which water is diverted.

In determining the quantity of water to be released so as to add to the flow of the Delaware River, the Neversink River shall be treated as if it flowed into the Delaware River above Port Jervis, and the number of second feet of water released from the impounding reservoir on the Neversink River shall be added to the number of second feet of water released from other reservoirs, so as to determine whether the quantity of water, required by this decree to be released, has been released.

(c) That the State of New Jersey and the Commonwealth of Pennsylvania, through accredited representatives, shall at all reasonable times have the right to inspect the dams, reservoirs and other works constructed by the City of New York and to inspect the diversion areas and the inflow, outflow and diverted flow of said areas, and to inspect the meters and other apparatus installed by the City of New York and to inspect all records pertaining to inflow, outflow and diverted flow.

2. The diversion herein allowed shall not constitute a prior appropriation and shall not give the State of New York and City of New York any superiority of right over the State of New Jersey and Commonwealth of Pennsylvania in the enjoyment and use of the Delaware River and its tributaries.

3. The prayer of the intervener, Commonwealth of Pennsylvania, for the present allocation to it of the equivalent of 750 million gallons of water daily from the Delaware River or its Pennsylvania tributaries is denied without prejudice.

4. The prayer of the Commonwealth of Pennsylvania for the appointment of a river master is denied without prejudice.

5. This decree is without prejudice to the United States and particularly is subject to the paramount authority of Congress in respect to navigation and navigable waters of the United States, and subject to the powers of the Secretary of War and Chief of Engineers of the United States Army in respect to navigation and navigable waters of the United States.

6. Any of the parties hereto, complainant, defendants or intervenor, may apply at the foot of this decree for other or further action or relief and this Court retains jurisdiction of the suit for the purpose of any order or direction or modification of this decree, or any supplemental decree that it may deem at any time to be proper in relation to the subject matter in controversy.

7. The costs of the cause shall be divided and shall be paid by the parties in the following proportions: State of New Jersey 35 per cent., City of New York 35 per cent., State of New York 15 per cent., Commonwealth of Pennsylvania 15 per cent.

The CHIEF JUSTICE and MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.