David F. Lee, Jr., J.
In this article 78 proceeding petitioners seek a judgment in the nature of mandamus.
The petitioners in their capacities as Mayor and Trustees of the Village of Walton, as citizens of the Village of Walton and inhabitants of the watershed of the West Branch of the Delaware River, request that: “a judgment be entered commanding the respondents with reasonable dispatch to acquire such lands, rights and easements and construct or provide for such structures, including sewerage systems and sewage treatment plants, as the New York State Department of Health deems necessary for the Village of Walton, and to thereafter operate and maintain or provide for the operation and maintenance of said works 5 or in the alternative, that a judgment be entered permanently restraining the respondents from using the waters of the West Branch of the Delaware River and of the Cannonsville Reservoir for any purpose whatsoever; and for such other and further relief as to the Court may seem just and proper.”
In 1929 the New York State Water Power and Control Commission approved a map and plan to provide the City of New York with an additional supply of water from certain tributaries of the Delaware River. The map and plan were approved by the United States Supreme Court in New Jersey v. New York (283 U. S. 336, 805).
In 1949 a similar map and plan were approved by the Board of Water Supply and the Board of Estimate of the City of New York for an additional supply of water from the West Branch of the Delaware River, and for construction of a dam and reservoir in the vicinity of Cannonsville, New York. The approval was conditioned upon the City of New York securing a modification of the decree of the United States Supreme Court in the *393 New Jersey v. New York case (supra), and upon approval by the New York State Water Power and Control Commission.
The Water Power and Control Commission was charged in 1950, under then section 523 of the Conservation Law, and its successor, the Water Resources Commission is charged presently under section 451 of the Conservation Law, with conducting public hearings and making decisions on applications or petitions for new or additional water supply, or for new or additional source or sources of water supply. Pursuant to the mandate hearings were conducted at Delhi, New York, and on November 14, 1950, a decision was rendered.
The commission approved the Oannonsville project, subject to conditions set forth in the decision, and made available to the City of New York an additional water supply of upward of 300 million gallons per day. The United States Supreme Court, in New Jersey v. New York (347 U. S. 995) issued a decree amending its earlier decision (New Jersey v. New York, 283 U. S. 805, supra), thus authorizing the City of New York to divert water from the West Branch of the Delaware River, on which the Village of Walton is located. The petitioners and the respondents urge the commission decision as authority in support of their contentions in this proceeding.
Opposing the application in 1950 by the City of New York to the Water Power and Control Commission for approval of the maps and plans for the Oannonsville Reservoir were Delaware County, the towns, the villages (including the Village of Walton), business corporations, sportsmen through their organized clubs, and individual property owners. The Village of Walton and the other villages contended at that time that “ they probably will be faced with the necessity of constructing and improving local facilities for disposal of sewage wastes in order to protect the water supply from this reservoir.” Water from the reservoir reaches the city by gravity flow to Rondout Reservoir from which it flows by gravity into the Delaware aqueduct tunnel and eventually into the city’s distribution system. The City of New York proposed to protect the purity of the water from the proposed reservoir by rigid restrictions on the character and use of the watershed tributary to the reservoir, by long storage in successive reservoirs, and multiple chlorination. The commission found no additional treatment was then necessary although it was aware that some sewage effluent was being discharged, without treatment, directly into the West Branch of the Delaware River by certain of the municipalities and inhabitants of the drainage area. The commission reserved the right to require additional sanitary precautions or further *394 treatment or purification should future analyses and inspections indicate a need for such action. Although no further treatment was regarded as necessary the commission did not regard the water as safely potable without additional treatment until it reached a distribution reservoir.
The decision made by the Water Power and Control Commission in 1950 includes findings of fact. Finding of Fact No. 34 states: “ Sewage effluent from the communities and inhabitants throughout the drainage area eventually discharges either through sewerage systems or directly into the river. Some degree of treatment of sewage effluent is provided by certain of the municipalities in the shed. ’ ’
Finding of Fact No. 35 is urged by both the petitioners and respondents as supporting their contentions here. It reads: “ The officials of the city have indicated that where it is deemed necessary to provide additional treatment over and above that now provided or which might be required by the recently created State Water Pollution Board, in its study and classification of streams, costs of such additional treatment will be financed by the city. The Commission must require that the city, at its own expense, provide such treatment works as the State Department of Health might deem necessary in order to provide a satisfactory raw water at the reservoir site.”
The commission reserved the future right of the communities above or below the dam site to be supplied with water from the West Branch of the Delaware River or its tributaries.
A condition imposed, before initial use of the water from this source, was that the city, with the approval of the .State Department of Health, enact and put into effect rules and regulations for the protection of the water from contamination. This the city has done and the regulations were approved by the Department of Health in June, 1956. This condition is set forth in the decision of the Water Power and Control Commission and provides : “ C. Before any water from this proposed source may be used for any purpose, the officials of the city, with the approval of the State Department of Health, must have enacted and put into effect rules and regulations for the protection from contamination of the water from this additional source of water supply, must have put this watershed into condition conformable with such rules and regulations and to that end must acquire such lands, rights and easements and construct or provide for such structures including sewerage systems and sewage treatment plants as the State Department of Health may deem necessary and the city must thereafter operate and maintain or provide for the operation and maintenance of such works. It is *395 recommended that these rules and regulations be so enacted as to permit the continued enjoyment of the recreational facilities of this watershed by permitting a reasonable use of this watershed and the reservoir to be built hereunder for hunting, fishing and other allied uses insofar as such uses may be compatible with the interests of public health.”
In Finding of Fact No. 35, supra, reference was made to the State Water Pollution Control Board. This board was created by the Water Pollution Control Act (L. 1949, ch. 666). The purpose of the act was to safeguard the waters of the State from pollution by preventing any new pollution, and by abating pollution existing when the chapter was enacted (Public Health Law, § 1201).
In 1950 the Water Pollution Control Board adopted standards of quality and purity for the waters of the State and provided for seven classes of fresh surface water as part of the comprehensive State-wide program of water pollution control envisaged by the Water Pollution Control Act.
Included among the classes of water established by the Water Pollution Control Board were Class AA and Class A for drinking, and Class B for bathing and other uses except as a source of water supply for drinking, culinary or food processing purposes. The other five classes are not here important.
In 1960 the powers and duties of the Water Power and Control Commission were transferred to the Water Resources Commission (Conservation Law, § 429; formerly § 427, added by L. 1960, ch. 7; reman. § 428 and amd. by L. 1961, ch. 490) which was created by chapter 7 of the Laws of 1960. The Water Pollution Control Board was abolished by chapter 490 of the Laws of 1961, but the board’s functions with respect to water pollution control were transferred to the State Department of Health (Public Health Law, § 1205) and the Water Resources Commission (Conservation Law, § 427) by chapter 490 of the Laws of 1961.
In 1964 the New York State Department of Health issued a revised “ 'Comprehensive Plan for the Prevention and Abatement of Pollution” of the surface waters of the Delaware River Drainage Basin. This plan was approved by the Water Resources Commission. The West Branch of the Delaware River at Walton was classified as Class B waters suitable for bathing and any other use except as a source of water supply for drinking, culinary or food processing.
The Water Pollution Control Act makes it unlawful for any person, public or private corporation, municipality, or other legal entity throughout the State to pollute the waters of the State (Public Health Law, § 1220). Polluting wastes are to be *396 treated, so far as possible, to bring the receiving waters into compliance with the standards of quality which have been established (Public Health Law, § 1223).
The Village of Walton is now, and has been for a number of years, discharging septic tank effluents and untreated sewage through multiple storm-water outlets and private sewage disposal drains into the West Branch of the Delaware River. In the “ Comprehensive Plan,” supra, a time schedule is established for the abatement of pollution by the Village of Walton by September 1, 1967 and it is stated that if a municipal sewerage system is not provided within a reasonable time, individual property owners, discharging sewage into the West Branch of the Delaware Biver, shall be required to provide facilities for their own sewage disposal.
Petitioners contend that Finding of Fact No. 35, supra, expressly requires the City of New York at its own expense to provide the sewerage systems and sewage treatment plants as set forth by the State Department of Health in its “ Comprehensive Plan,” and that there was thus imposed a strict contractual duty, as a condition of their diversion of the West Branch of the Delaware Biver.
The City of New York urges that Finding of Fact No. 35, supra, cannot be construed to impose such a duty.
Bespondents object in point of law to the petition upon the following grounds:
“ 1. The petitioners are not the real parties in interest. The Village of Walton is a necessary party.
“ 2. The petition fails to state facts sufficient to entitle the petitioners to the relief sought and the petitioners have no right to such relief.
“3. Neither a mandatory nor prohibitive injunction can properly be granted in a proceeding under CPLR Art. 78.
“ 4. Petitioners have an adequate remedy in that their rights, if any, would be enforcible in a plenary action or by application to the Water Besources Commission.
“ 5. Petitioners have not established a clear legal right to the use of either [sic] the remedy nor the relief sought.”
The “ Comprehensive Plan,” under the heading “ Significant Facts in Delation to Abatement of Existing Pollution ” states: ‘ ‘ With respect to abatement of existing pollution, the law calls for a sequence of procedures according to a program consistent with the announced public policy. This program is mandated by Section 1210, ‘ Jurisdiction of the Department; Authority; Powers and Duties ’. Taking into account both the permissive powers and the mandatory duties of the Department, it is neces *397 sary for the Department to (1) develop a comprehensive plan for abatement of existing pollution, (2) undertake to have such plan executed through cooperative means as far as possible and (3) resort to issuance and enforcement of orders only when the circumstances are reasonable and necessary to obtain the desired objective.” The first step, the issuance of a comprehensive plan, has been accomplished and the second phase, insofar as the ‘ ‘ Comprehensive Plan ’ ’ pertains to the Village of Walton is now being undertaken, but no order has been issued under the third phase.
As the .situation now stands, neither the petitioners nor the Village of Walton have been ordered to construct a sewerage system or sewage treatment plant.
An article 78 CPLR proceeding now serves in place of the remedies formerly known as certiorari to review, mandamus and prohibition.
CPLR 7803 provides: “ The only questions that may be raised in a proceeding under this article are:
“ 1. whether the body or officer failed to perform a duty enjoined upon it by law; or
“ 2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or
‘ ‘ 3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or
‘ ‘ 4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.”
In McKinney’s Practice Commentary (McKinney’s Cons. Laws of N. Y., Book 7B, CPLR 7801, p. 17) it is stated: “ The language of CPA § 1283 1 The classifications * * * of certiorari to review, mandamus and prohibition are hereby abolished ’ was omitted in recognition that the adoption of Article 78 of the CPA (now Article 78 of the CPLR) left untouched the substantive rights formerly enforced under the writs, merely eliminating procedural distinctions ’ ’.
Whether or not mandamus or relief pursuant to CPLR article 78 is available to petitioners at this time is the primary question for determination by this court. In Matter of Colonial Beacon Oil Co. v. Finn (245 App. Div. 459, 461, affd. 270 N. Y. 591) the court stated: A peremptory order of mandamus may be granted only to enforce a clear legal right. The mandamus issues to compel the performance of official duty clearly imposed *398 by law, where there is no other adequate specific remedy. * * * Its function is to compel the doing of a specific thing based upon a legal right.” '
In Matter of Irving v. Finger Lakes Comm. (12 Misc 2d 1087, 1088, 1089) the court succinctly pointed out:
1 ‘ Mandamus, as it is generally thought of, is a two-pronged remedy; it is available both to compel performance of a duty specifically enjoined by law, and to review an administrative determination arrived at otherwise than as the result of a prescribed quasi-judicial hearing (1 Benjamin on Administrative Adjudication in the State of New York, p. 351). * * *
‘ ‘ At the outset of any consideration of the availability of mandamus (in either form) here, the court is met with the proposition that the petitioners must establish a clear legal right to the relief sought. (Matter of Pruzan v. Valentine, 282 N. Y. 498, 501; Matter of New York Post Corp. v. Leibowitz, 2 N Y 2d 677, 684; 1 Benjamin on Administrative Adjudication in the State of New York, p. 352.) ”
In the event that an abatement order is entered by the Commissioner of Health, it is provided that not only may review be had before the Water Resources Commission (Public Health Law, § 1245) and in the courts as provided in article 78 of the CPLR (Public Health Law, § 1244), but in case of discharges of sewage and wastes existing on April 20,1949, it is also provided in section 1223 of the Public Health Law that, ‘1 If the commissioner finds, after a hearing conducted pursuant to title VI of this article, that such discharge constitutes pollution in contravention of the classifications made and the standards adopted by the water pollution control board or the water resources commission, he shall enter an order directing the polluter to take such steps as may be necessary to abate the polluting content of such discharge to conform with the standards so established. The commissioner shall consider evidence received at such hearing relating to the adequacy and practicability of various means of abating the polluting content of such discharge and the financial ability of the polluter so to abate. If the commissioner finds that immediate, abatement of such discharge would be impossible or impracticable either because no adequate or practical means of disposal or treatment is known or because of financial inability, his order shall establish the reasonable time or times within which the required steps, both intermediate and final, are to be taken.”
The court is of the opinion that no clear legal right to the relief sought by petitioners has been shown. The proceeding should be dismissed with leave to renew, and without costs.