[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 21, 2002
THOMAS K. KAHN
CLERK

_____

No. 02-10135

_____

D. C. Docket No. 01-00026 CV-RWS-2

THE STATE OF GEORGIA,

Plaintiff-Appellee,

LAKE LANIER ASSOCIATION,

Proposed Intervenor,

versus

THE UNITED STATES ARMY CORPS OF ENGINEERS, et al.,

Defendants,

SOUTHEASTERN FEDERAL POWER CUSTOMERS, INC.,
THE STATE OF FLORIDA,

Proposed Intervenors-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Georgia

_____

**(August 21, 2002)**

Before BARKETT and MARCUS, Circuit Judges, and HIGHSMITH[*], District Judge.

BARKETT, Circuit Judge:

The State of Florida and Southeastern Federal Power Customers, Inc. ("SeFPC") appeal from the denial of their motions to intervene as defendants in the State of Georgia's lawsuit against the Army Corps of Engineers (the "Corps"), which seeks to compel the Corps to increase the water supply available to the City of Atlanta from a source under the control of the Corps.

## BACKGROUND

Georgia, Alabama and Florida share the water supply provided by interconnected rivers that flow through the three states. The Chattahoochee River originates in the mountains of north Georgia, flows southwesterly through Georgia, and becomes the Apalachicola River at the Florida border. Together with Alabama's Flint River, the Chattahoochee and Apalachicola make up the Apalachicola-Chattahoochee-Flint Basin ("ACF Basin"). In 1997, the Apalachicola-Chattahoochee-Flint Compact ("ACF Compact") was enacted by the legislatures and Governors of Alabama, Florida and Georgia, then passed by Congress. Its purpose includes "promoting interstate comity, removing causes of

_____

[*]Honorable Shelby Highsmith, U.S. District Judge for the Southern District of Florida, sitting by designation.

2

present and future controversies, equitably apportioning the surface waters of the ACF, engaging in water planning, and developing and sharing common data bases." ACF Compact, Art. I.

The Compact does not contain a formula for determining how much water each state is entitled to receive from the ACF Basin. Rather, the Compact requires the three member states to negotiate a water allocation agreement. ACF Compact, Art. VII(a). Georgia, Florida and Alabama have been in negotiations to determine an allocation formula since they enacted the Compact into law, to no avail. The Compact provides that it

> shall be terminated and thereby be void and of no further force and effect if . . . Alabama, Florida and Georgia fail to agree on an equitable apportionment of the surface waters of the ACF . . . by December 31, 1998, unless the voting members of the ACF Basin Commission unanimously agree to extend this deadline.

ACF Compact, Art. VIII(a)(3). Although the three states have not agreed to a water allocation formula, they have agreed to extend the deadline on twelve separate occasions. Most recently, the states agreed to extend the deadline for the determination of an allocation formula until January 31, 2003.

In the 1940s, prior to the enactment of the ACF Compact, Congress authorized the Corps to create Lake Lanier, a reservoir north of Atlanta, by

constructing Buford Dam across the Chattahoochee River."[1]  The reservoir and

dam remain under the management of the Corps.  Lake Lanier is contained within

the ACF Basin and thus subject to the ACF Compact.

Two years ago, the Governor of Georgia made a written water supply

request asking the Corps to commit to making increased releases of water from the

Buford Dam until the year 2030 in order to assure a reliable municipal and

industrial water supply to the Atlanta region.  Specifically, Georgia requested that

the Army Corps take the following actions:

1.  Allow municipal and industrial withdrawals from Lake Lanier to increase as necessary to the projected annual need of 297 mgd in 2030;

2.  Increase the water released from the Buford Dam sufficiently to permit municipal and industrial withdrawals in the Chattahoochee River south of the dam to be increased as necessary to the projected annual need of 408 mgd in 2030;

3.  Enter into long-term contracts with Georgia or municipal and industrial water users in order to provide certainty for the requested releases;

4.  Ensure that sufficient flow is maintained south of the Buford Dam to provide the requisite environmental quality – that is, assimilate discharged wastewater; and

---

[1]The established purposes of the Buford Project included navigation, hydropower generation and flood control.  As explained below, one focus of the underlying litigation will be whether municipal water supply is also a purpose of the project.  Indeed, in 2001, approximately 2.7 million people depended on Lake Lanier or the nearby portions of the Chattahoochee River for their water supply; that number is expected to increase to 4 million by the year 2030.  In 1999, the average withdrawal from Lake Lanier was 131.54 million gallons per day (mgd), and the average withdrawal from the Chattahoochee River in that region was 277.7 mgd.  The region also depends on the Chattahoochee to assimilate wastewater discharges.

5.　　　Assess fees on the municipal and industrial water users in order to recoup any losses incurred by a reduction in the amount of hydropower generated by the dam as a result of the increased withdrawals or releases.

After approximately nine months without a response from the Corps, Georgia filed suit seeking (1) an order compelling the Corps to grant its water supply request; (2) a declaration that the Corps has the authority, without additional Congressional authorization, to grant its request; (3) a declaration that the Corps is subject to state law insofar as it does not conflict with federal law and that state law mandates that the Corps grant the request; and (4) a declaration that, if applicable federal law prohibits the Corps from granting Georgia's request, then such federal law is unconstitutional on its face or as applied by the Corps.[2] Georgia characterizes the central issue of this case as a determination of the Corps' obligations to Georgia regarding Lake Lanier and the Buford Project under federal and state law.

The state of Florida filed a motion to intervene as of right or permissively as a defendant in the suit and simultaneously filed a motion to dismiss, or, in the alternative, to abate proceedings. Florida argued, as it does on appeal, that Georgia was seeking to effect a de facto partial apportionment of the water in the ACF

---

[2]Georgia also sought an injunction permitting withdrawals and releases sufficient to meet its water supply needs during the pendency of this litigation.

Basin in violation of the ACF Compact. Florida asserted that if Georgia's water supply request is granted, more water will be consumed upstream in the ACF Basin and less will be available for uses in Florida because the flow in the Apalachicola River, located completely within Florida's borders, depends almost entirely on the amount of water flowing in the Chattahoochee. Florida asserts that the Compact is designed to be the exclusive mechanism to resolve disputes involving the ACF Basin, and that this litigation improperly contravenes the ACF Compact.

The district court denied the motion to intervene on the ground that Florida has no legal interest in the subject matter of the litigation. It found that the controversy between Georgia and the Corps involves only an intrastate allocation of water, and that the disposition of the case would not, as a practical matter, impair Florida's ability to protect its interests, because it would not impede the viability of the ACF Compact or affect Florida's ability to file an equitable apportionment claim in the Supreme Court. The court also denied Florida's motion for permissive intervention, holding that Florida's motion to dismiss or abate the action had no issues of law or fact in common with Georgia's claims and that allowing Florida to intervene would prejudice the original parties to the action.

Six months after Georgia filed suit, SeFPC also filed a motion to intervene as of right or permissively as a defendant, along with a proposed answer to

Georgia's complaint. SeFPC's members are "preference customers" of the Buford Project, which means they are entitled to purchase surplus hydropower from the Southeastern Power Marketing Administration ("SEPA"), a power marketing agency of the Energy Department.[3] SeFPC argued that, unlike hydropower, municipal and industrial water supply is not an established purpose of the Buford Project, and that granting Georgia's water supply request would reduce the availability of hydropower to SeFPC's members.

The court denied SeFPC's motion to intervene on the ground that the case involves only the legal standards applicable to Lake Lanier and the legal relationship between the Corps and Georgia with respect to intrastate water allocation. It found that denying SeFPC's motion to intervene would not preclude SeFPC from enforcing its rights under its contracts with the Corps. It also denied SeFPC's motion for permissive intervention because it found that the Corps could adequately defend against Georgia's claims.

Finally, on April 15, 2002, after the district court had denied the motions to intervene, and before this Court heard oral argument on the appeal, the Corps denied Georgia's water supply request. It concluded that it lacked the "legal

---

[3]Pursuant to the Flood Control Act, 16 U.S.C. § 825s, public bodies and electric cooperatives are given preference in the sale of electric power and energy generated at reservoirs under the control of the Department of the Army.

7

authority to grant Georgia's request without additional legislative authority, because the request would involve substantial effects on project purposes and major operational changes."[4]

## STANDARD OF REVIEW

We review the denial of a motion to intervene as of right de novo. Purcell v. BankAtlantic Fin. Corp., 85 F.3d 1508, 1512 (11th Cir. 1996). Subsidiary factual findings are subject to review for clear error. Meek v. Metro. Dade County, 985 F.2d 1471, 1477 (11th Cir. 1993). Orders denying permissive intervention are subject to review for abuse of discretion. Id.[5]

## DISCUSSION

Rule 24(a) provides for intervention as a matter of right as follows:

Upon timely application anyone shall be permitted to intervene in an

---

[4]We note at the outset that, while the denial of Georgia's water supply request may affect the merits of the underlying dispute, it does not affect our analysis of the district court's denial of the motions to intervene. In either case, the district court's review occurs under § 706 of the Administrative Procedure Act ("APA"), which permits a reviewing court to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1), and to "hold unlawful and set aside agency action, findings, and conclusions found to" meet certain criteria, id. § 706(2). While the review conducted under the two sections is different, the interests implicated and the parties' abilities to protect those interests remain the same.

[5]We have also stated that the denial of intervention as a matter of right under Rule 24(a) is reviewed "for error." Meek, 985 F.2d at 1477 (citing FSLIC v. Falls Chase Special Taxing Dist., 983 F.2d 211, 214-155 (11th Cir. 1993); Walters v. City of Atlanta, 803 F.2d 1135, 1151 n.16 (11th Cir. 1986)). Those cases, however, do not explain that standard further and do not specify how, if at all, it differs from de novo review. Accordingly, we review de novo the denial of a motion to intervene as of right.

action: (1) when a statute of the United States confers an
unconditional right to intervene; or (2) when the applicant claims an
interest relating to the property or transaction which is the subject of
the action and the applicant is so situated that the disposition of the
action may as a practical matter impair or impede the applicant's
ability to protect that interest, unless the applicant's interest is
adequately represented by existing parties.

Fed. R. Civ. P. 24(a). Under Rule 24(a)(2), a party is entitled to intervention as a

matter of right if the party's interest in the subject matter of the litigation is direct,

substantial and legally protectable. Meek, 985 F.2d at 1477.

Rule 24(b) provides for permissive intervention as follows:

Upon timely application anyone may be permitted to intervene in an
action: (1) when a statute of the United States confers a conditional
right to intervene; or (2) when an applicant's claim or defense and the
main action have a question of law or fact in common. When a party
to an action relies for ground of claim or defense upon any statute or
executive order administered by a federal or state governmental
officer or agency or upon any regulation, order, requirement or
agreement issued or made pursuant to the statute or executive order,
the officer or agency upon timely application may be permitted to
intervene in the action. In exercising its discretion the court shall
consider whether the intervention will unduly delay or prejudice the
adjudication of the rights of the original parties.

Fed. R. Civ. P. 24(b). Permissive intervention under Fed. R. Civ. Proc. 24(b) is

appropriate where a party's claim or defense and the main action have a question

of law or fact in common and the intervention will not unduly prejudice or delay

the adjudication of the rights of the original parties. Walker v. Jim Dandy Co., 747

F.2d 1360, 1365 (11th Cir. 1984).

9

### A. Florida's Motion to Intervene

#### 1. Intervention as of Right

Before a party can intervene as a matter of right, it must timely move to intervene. The proposed intervenor must show that it has an interest in the subject matter of the suit, that its ability to protect that interest may be impaired by the disposition of the suit, and that existing parties in the suit cannot adequately protect that interest. Since no party disputes that Florida timely filed its motion to intervene, we consider each of the remaining criteria in turn.

##### a. Interest in the Subject Matter of the Suit

Florida argues that it has a direct, substantial and legally protectable interest in the subject matter of the suit because the relief Georgia requests, namely, an order compelling the Corps to increase the supply of water from Lake Lanier available for use by the city of Atlanta, will have a direct impact on Florida. If Georgia's water supply request is granted, more water will be diverted from Lake Lanier for municipal and industrial uses near Atlanta and additional releases will be authorized to permit increased wastewater discharges. Florida argues that those actions would adversely affect its downstream interests by hindering the continued existence of endangered or threatened species in Florida and reducing the stock of

fish and seafood available for harvest in the Apalachicola River and Bay.[6]

Moreover, Florida argues that a declaration that the Corps must "immediately grant [Georgia's] water supply request" would violate federal law requiring the Corps to prepare an environmental impact statement and ensure that its actions are not likely to jeopardize the continued existence of any endangered or threatened species in Florida. Georgia's lawsuit, Florida maintains, demands that the Corps act without regard to the Endangered Species Act, 16 U.S.C. § 1531, et seq. ("ESA"), and the National Environmental Policy Act, 42 U.S.C. § 4321, et seq. ("NEPA"). Florida asserts that, because granting the water supply request would have a negative impact upon the continued existence of endangered or threatened species in Florida, it should be permitted to defend against Georgia's claim that any law impeding its request is unconstitutional.

Florida further argues that its membership in the ACF Compact confers additional rights with regard to the subject matter of Georgia's suit. The Compact states that

[i]t is the intent of the parties to this Compact to develop an allocation

_____

[6]According to Florida, the Apalachicola River has the highest species density of amphibians and reptiles in the North American Continent north of Mexico. The Apalachicola is also a spawning ground for the Gulf Sturgeon, which is federally listed as a threatened species, and the Gulf Striped Bass, which is listed by Florida as a species of special concern. The Apalachicola River empties into the Apalachicola Bay, which provides approximately 90% of Florida's oyster harvest.

formula for equitably apportioning the surface waters of the ACF Basin among the states while protecting the water quality, ecology and biodiversity of the ACF, as provided in the Clean Water Act, 33 U.S.C. Sections 1251 et seq., the Endangered Species Act, 16 U.S.C. Sections 1532 et seq., the National Environmental Policy Act, 42 U.S.C. Sections 4321 et seq., the Rivers and Harbors Act of 1899, 33 U.S.C. Sections 401 et seq., and other applicable federal laws.

ACF Compact, Art. VII. Florida argues that the litigation contravenes the congressional intent of the ACF Compact as well as the intent of the state party signatories to the Compact. Because the Compact deals with the same subject matter as Georgia's litigation, Florida claims that it has a clear, protectable interest in the litigation. Florida argues that the litigation improperly interferes with the congressional intent of the ACF Compact, because it is through Compact negotiations that disputes concerning the ACF basin are to be resolved.

Georgia replies that this case involves the allocation of water in Lake Lanier between water supply and hydropower generation, and the outcome will not affect Georgia's obligation to deliver to Florida its equitable share of water. Georgia admits that the outcome of the litigation may make it more difficult for Georgia to deliver to Florida its equitable share, but contends that it will not affect the amount of water that Georgia is legally obligated to deliver to Florida.[7] Georgia further

---

[7]The Compact provides that "each state shall be responsible for using its best efforts to achieve compliance with the allocation formula adopted pursuant to this Article. Each such state agrees to take such actions as may be necessary to achieve compliance with the allocation formula." ACF Compact, Art. VII.

argues that the possibility that the litigation will have an indirect impact on Florida's economic interest is insufficient to establish that Florida has a legally protectable interest that would justify intervention, citing United States v. South Florida Water Mgmt. Dist., 922 F.2d 704, 710 (11th Cir. 1991) ("By requiring that the applicant's interest be . . . 'legally protectable,' it is plain that something more than an economic interest is necessary. What is required is that the interest be one which the substantive law recognizes as belonging to or being owned by the applicant." (quoting New Orleans Pub. Serv., Inc. v. United Gas Pipe Line Co., 732 F.2d 452, 464 (5th Cir. 1984)) (emphasis in original)).

To determine whether Florida possesses the requisite interest for intervention purposes, we look to the subject matter of the litigation. Georgia claims that it only seeks an intrastate apportionment of water and a declaration of the Corps' obligations with regard to intrastate water. For intervention purposes, Florida's interests "need not, however, be of a legal nature identical to that of the claims asserted in the main action." Chiles v. Thornburgh, 865 F.2d 1197, 1214 (11th Cir. 1989) (quotations omitted). Although the remedy sought in Georgia's lawsuit may occur within Georgia's borders, it will have a practical effect upon water flowing in the Chattahoochee River, water that is part of the ACF basin and to which Florida has a right. Initially, Georgia seeks an order compelling the

13

Corps to grant the water supply request, which would allow Georgia to increase withdrawals for municipal and industrial purposes. Unlike releases for the generation of hydroelectricity, where the water used is discharged into the Chattahoochee and continues its southward flow, water released for municipal purposes is consumed and not discharged into the river. Further, Georgia seeks additional releases from Lake Lanier to assimilate increased wastewater discharges. That wastewater would flow downstream to Florida.

We find that Florida has a legally protectable interest in the quality and quantity of water in the Apalachicola River and Bay. See, e.g., Hinderlider v. La Plata River & Cherry Creek Ditch Co., 304 U.S. 92, 104 (1938) ("The river throughout its course in both states is but a single stream, wherein each state has an interest which should be respected by the other.") (quoting Wyoming v. Colorado, 259 U.S. 419, 466 (1922)); New Jersey v. New York, 283 U.S. 336, 342-43 (1931) (stating that an interstate stream "offers a necessity of life that must be rationed among those who have power over it" and that, although an upstream state "has the physical power to cut off all the water within its jurisdiction[,] clearly the exercise of such a power to the destruction of the interest of lower States could not be tolerated [because b]oth States have real and substantial interests in the River that must be reconciled as best they may"). That interest exists irrespective of Florida's

14

participation in the ACF Compact. Indeed, a state's right to an equitable apportionment of water flowing through an interstate stream located within its borders is well established. Whenever "the action of one State reaches, through the agency of natural laws, into the territory of another State, the question of the extent and the limitations of the rights of the two states becomes a matter of justiciable dispute between them." Kansas v. Colorado, 206 U.S. 46, 97-98 (1907).

Because of the interrelatedness of the Chattahoochee and the Apalachicola, and the impact of diverting more water from Lake Lanier for municipal purposes and permitting additional releases to accommodate increased wastewater discharges, we find that Florida's interest in the water in the ACF Basin could be affected by the resolution of Georgia's lawsuit.[8] Thus, we turn to the question of

---

[8]In determining that Florida lacked the requisite interest to justify intervention in this lawsuit, the district court seemed to limit the relief it would grant by stating that

> the ultimate standard of review under the APA is very narrow, and the Court cannot substitute its judgment for that of the Corps. Given the technical and sensitive circumstances surrounding the operation of Lake Lanier and Buford Dam, the Court will defer to the expertise of the Corps for a final agency decision on Georgia's Water Supply Request. If the evidence were to show that the Corps' decision was unlawfully withheld or unreasonably delayed, the Court will compel the Corps to respond to the Water Supply Request, but under the APA, the Court cannot direct the Corps specifically to grant or deny the request.

The district court continued, however, as follows:

> The Court will address whether the Corps has the authority under federal law or obligation under state law to answer Georgia's Water Supply Request . . . . Again, even if the Court were to find that the Corps has authority under federal law, without additional congressional authorization to grant the Water Supply

15

whether the outcome of this litigation will, as a practical matter, impair Florida's ability to protect those rights.

b. *Impact of the Litigation on Florida's Ability to Protect Its Interest*

Georgia argues that, even if Florida has a legal interest sufficient for intervention, it is still not entitled to intervention because the disposition of this action will not "impair or impede" Florida's "ability to protect that interest" by means both of the ACF Compact negotiations and by filing an original action in the United States Supreme Court. See Hinderlider, 304 U.S. at 104 (describing the "two means provided by the Constitution for adjusting interstate controversies"). Georgia argues that its lawsuit does not seek to enjoin or interfere with the ACF Compact process in any way.

Initially, we note that the Compact addresses the possibility that one or more of the parties will seek to increase its water consumption while negotiations are pending. Article VII of the ACF Compact specifically provides that

> Request, the Court will not substitute its judgment for that of the Corps. However, if the Court were to find that the Corps is mandated by Georgia law to honor Georgia's request, only then will the Court decide whether the Corps must grant the request, which is the specific remedy that Georgia seeks in its Complaint.

Thus, the district court did not dismiss any of Georgia's claims or state specifically that it would not grant any of the relief requested. Nothing in the district court's opinion, therefore, suggests that it would not compel the Corps to grant Georgia's water supply request, thereby impacting the flow downstream in Florida.

16

any person who is withdrawing, diverting, or consuming water resources of the ACF Basin as of the effective date of this Compact . . . may increase the amount of water resources withdrawn, diverted or consumed to satisfy reasonable increases in the demand of such person for water between the effective date of this Compact and the date on which an allocation formula is approved by the ACF Basin Commission as permitted by applicable law. Each of the state parties to this compact further agree to provide written notice to each of the other parties to this compact in the event any person increases the withdrawal, diversion or consumption of such water resources by more than 10 million gallons per day on an average annual daily basis, or in the event any person who was not withdrawing, diverting or consuming any water resources from the ACF Basin as of the effective date of this Compact, seeks to withdraw, divert or consume more resources from the ACF Basin as of the effective date of this compact, seeks to withdraw, divert or consume more than one million gallon per day on an annual daily basis from such resources. This Article shall not be construed as granting any permanent, vested or perpetual rights to the amounts of water used between January 3, 1992 and the date on which the Commission adopts an allocation formula.

ACF Compact, Art. VII. It is not clear, however, what impact an order compelling the Corps to enter the long-term contracts Georgia seeks in this lawsuit would have on the Compact negotiations.

More importantly, however, even if no vested right under the Compact is achieved pursuant to this lawsuit, there exists the possibility that the historical pattern of extending the Compact deadline will continue and that the three states will remain at an impasse regarding the allocation of water. In that event, should Georgia prevail in its lawsuit, any negative impact upon the Apalachicola resulting from increased withdrawals from Lake Lanier would continue unabated for the

17

duration of the impasse. Since the Compact requires the _agreement_ of all three states – which cannot be compelled – it does not provide Florida a meaningful ability to protect its interests in this regard. Thus, the disposition of this action could impair or impede Florida's interests until such time, if any, that the parties reach agreement under the Compact.[9]

Georgia alternatively argues that Florida can adequately protect its rights through an original action in the Supreme Court of the United States. Florida acknowledges that it could seek an equitable apportionment of the waters of the ACF Basin in a proceeding under the exclusive jurisdiction of the Supreme Court, but it argues that the Court would almost certainly decline to exercise its jurisdiction over a matter that is presently being negotiated pursuant to a Compact created to achieve that same purpose. Florida further argues that in an equitable apportionment action, the Court would not re-adjudicate any issues already litigated in the district court, since an equitable apportionment action weighs the competing equities existing at the time the case is brought. See Nebraska v. Wyoming, 325 U.S. 589, 618 (1945). Florida thus suggests that if Georgia were successful in its suit against the Corps, the Supreme Court would honor the district

---

[9]The Compact only gives Florida a right to _negotiate_ a water allocation agreement with the two other states. As noted, Florida cannot force the other states consider its interests in the ACF Basin, and the Compact provides for no forum before a neutral third party in which Florida could plead its case.

18

court's decision that the Corps was obligated to grant Georgia's water supply request. Presumably – although Florida does not plainly say so – that could result in the Supreme Court deciding that Florida is entitled to less water than it would be entitled to absent a district court decision ordering the Corps to grant Georgia's water supply request.

Georgia replies that, if Florida could prove the requisite harm, the Supreme Court would exercise its jurisdiction and that, in so doing, proceedings in the Court would address a different issue than the issue in the present case – the Supreme Court would adjudicate Florida's rights to a certain quantity of water at the state line, which is not an issue before the district court. This response, however, does not address whether the Supreme Court might, as a practical matter, reach a different conclusion about Florida's equitable share if the district court in this case were to rule that the Corps is required to grant Georgia's water supply request.

There is a significant question regarding whether the Supreme Court would exercise its jurisdiction over an equitable apportionment action brought by Florida while the Compact is in effect and there is no proven shortage of water. Indeed, the Supreme Court has "substantial discretion to make case-by-case judgments as to the practical necessity of an original forum in [the Supreme] Court for particular disputes within [its] constitutional original jurisdiction," Texas v. New Mexico,

19

462 U.S. 554, 570 (1983), and none of the equitable apportionment cases decided by the Supreme Court has ever been brought while an interstate compact was being negotiated. Moreover, the Supreme Court has stated that its original jurisdiction should be invoked sparingly. Mississippi v. Louisiana, 506 U.S. 73, 76 (1992). In deciding whether to accept an action within its original jurisdiction, the Court considers "the nature of the interest of the complaining State" and "the availability of an alternative forum in which the issue tendered can be resolved." Id. at 77.[10]

Thus, Florida has no clear-cut and compulsory right to be heard by the Supreme Court. As long as the members of the Compact continue to negotiate, it seems

---

[10]In this regard, until there is a proven shortage of water for one or more of the states, it is not clear that the requisite threat of injury would exist to persuade the Supreme Court to exercise its original jurisdiction. See, e.g., Idaho v. Oregon, 462 U.S. 1017, 1027 (1983) ("A State seeking equitable apportionment under our original jurisdiction must prove by clear and convincing evidence some real and substantial injury or damage."); Colorado v. New Mexico, 459 U.S. 176, 187 n.13 (1982) ("Our cases establish that a state seeking to prevent or enjoin a diversion by another state bears the burden of proving that the diversion will cause it 'real or substantial injury or damage.' This rule applies even if the state seeking to prevent or enjoin a diversion is the nominal defendant in a lawsuit.") (internal citations and punctuation omitted). Moreover, an argument can be made that, although it is a not a judicial forum, the Compact provides an alternate mechanism by which the parties' dispute regarding their entitlements to the river flow might be resolved. See, e.g., Mississippi v. Louisiana, 506 U.S. 73, 77 (1992) ("[W]e explore the availability of an alternative forum in which the issue tendered can be resolved."); Texas v. New Mexico, 462 U.S. 554, 571 n.18 (1983) (finding that the Court would not exercise its original and exclusive jurisdiction because "[w]hen it is able to act, the [Pecos River] Commission is a completely adequate means for vindicating either State's interests. The need for burdensome original jurisdiction litigation, which prevents this Court from attending to its appellate docket, would seem slight."); Illinois v. Milwaukee, 406 U.S. 91, 93 (1972) (stating that the Court examines "the availability of another forum where there is jurisdiction over the named parties, where the issues tendered may be litigated, and where appropriate relief may be had"); see also Dyer v. Sims, 341 U.S. 22, 27 (1941) (explaining the benefits to resolving interstate disputes through a compact rather than litigation).

20

unlikely that the Supreme Court would choose to hear an equitable apportionment claim involving the ACF Basin. And, although Florida can cause the Compact to expire by refusing to sign further extensions, termination of the Compact requires consent of all three signatory states. ACF Compact, Art. VIII. Given the string of contingencies involved in determining whether Florida would even be able to bring an original action in the Supreme Court, we cannot say with certainty that Florida would be able to protect its interests through an equitable apportionment claim.

Moreover, assuming the Court did take jurisdiction of a future case filed by Florida, the resolution of Georgia's lawsuit might adversely affect Florida's future lawsuit. While the Supreme Court will take into account existing uses, it would not necessarily honor water rights obtained by a state or private entity prior to an equitable apportionment action. "The doctrine of equitable apportionment is neither dependent on nor bound by existing legal rights to the resource being apportioned . . . although existing legal entitlements are important factors in formulating an equitable decree, such legal rights must give way in some circumstances to broader equitable considerations." Idaho v. Oregon, 462 U.S. 1017, 1025 (1983). At the same time, the Supreme Court has also said that it "recognize[s] that the equities supporting the protection of existing economies will

usually be compelling. The harm that may result from disrupting established uses is typically certain and immediate." Colorado v. New Mexico, 459 U.S. 176, 187 (1982). If Georgia wins, its use of any additional amount of water from Lake Lanier might be considered "established," and Florida then would have to overcome this "existing economy."

Thus, Florida has proven that the disposition of this action "may as a practical matter impair or impede" its ability to protect its interest in the waters of the ACF Basin as required by Rule 24(a)(2).

c. *Ability of the Existing Parties to Represent Florida's Interest*

The proposed intervenor has the burden of showing that the existing parties cannot adequately represent its interest, but this burden is "treated as minimal." Clark v. Putnam County, 168 F.3d 458, 461 (11th Cir. 1999) (quoting Trbovich v. United Mine Workers, 404 U.S. 528, 538 n.10 (1972)). Florida's interest is to ensure that Georgia's actions do not deprive Florida of its equitable share of water. That interest is not represented by the Corps, which has no independent stake in how much water reaches the Apalachicola. See, e.g., Sierra Club v. Espy, 18 F.3d 1202, 1207-08 (5th Cir. 1994) (finding that the government did not adequately represent the interests of timber purchasers).

For the foregoing reasons, we reverse the district court's denial of Florida's

motion for intervention as of right, and thus need not address the issue of permissive intervention.[11]

## B. SeFPC's Motion to Intervene

### 1. Interest in the Subject Matter of the Suit

SeFPC's members have contracts to purchase hydropower from SEPA. The

---

[11]We note at this point that granting Florida's motion to intervene in this case raises a serious jurisdictional question. Specifically, the addition of Florida as a defendant in this lawsuit brought by Georgia might create a suit between two states within the original and exclusive jurisdiction of the Supreme Court. If that were true, the district court would be required to dismiss the case for lack of jurisdiction. See Mississippi v. Louisiana, 506 U.S. at 78 ("Though phrased in terms of a grant of jurisdiction to this Court, the description of our jurisdiction as 'exclusive' necessarily denies jurisdiction of such cases to any other federal court."). Moreover, we note that it is not at all clear whether the potential impact on the district court's jurisdiction should be considered when deciding whether to grant a motion to intervene as of right.

Without addressing the series of complex procedural questions raised in this regard, we find it sufficient to conclude that permitting Florida to intervene will not deprive the district court of jurisdiction over the case. Indeed, to constitute "a justiciable controversy between the States . . . it must appear that the complaining State has suffered a wrong through the action of the other State, furnishing ground for judicial redress, or is asserting a right against the other State which is susceptible of judicial enforcement according to the accepted principles of the common law or equity systems of jurisprudence." Massachusetts v. Missouri, 308 U.S. 1, 15 (1939). Further, to invoke the Supreme Court's original and exclusive jurisdiction, "a plaintiff State must first demonstrate that the injury for which it seeks redress was directly caused by the actions of another State." Pennsylvania v. New Jersey, 426 U.S. 660, 663 (1976). Thus, "[t]he model case for invocation of th[e Supreme] Court's original jurisdiction is a dispute between States of such seriousness that it would amount to casus belli if the States were fully sovereign." Mississippi v. Louisiana, 506 U.S. at 77.

In this case, there is no such dispute between Florida and Georgia. The states do not seek relief from each other but, rather, want the Corps to act on the water supply request in opposite ways – Georgia seeks to have the Corps grant its request, while Florida wants to have it denied. Thus, although Florida technically will be a defendant and Georgia a plaintiff, Georgia does not seek redress for any harm caused by Florida, and Florida will not be subjected directly to any ruling of the district court. Accordingly, permitting Florida to intervene in this case will not deprive the district court of jurisdiction.

23

contracts do not obligate SEPA to deliver a certain amount of hydropower to SeFPC, but instead are output contracts pursuant to which SEPA must deliver all of the hydropower available. SEPA receives its power from the Corps, which generates the power at Buford Dam on Lake Lanier. Under the arrangement between SEPA and the Corps, the Corps is obligated to deliver to SEPA the amount of surplus power generated. If less hydropower is generated at the Dam, the Corps delivers less hydropower to SEPA, and SEPA in turn delivers less hydropower to SeFPC.

SeFPC argues that it has a "direct, substantial and legally protectable interest in the subject matter of the suit" because if Georgia's water supply request is granted, it will diminish the amount and value of power that SeFPC members receive from the Buford Project, thereby reducing the value of the contracts those members have for power. SeFPC notes that Congress authorized the Buford Project for hydropower production and flood control, and stresses that the Corps must comply with the specific Congressional authorization in managing, operating, and administering the Buford Project. SeFPC argues that Congressional authorization of the Project, along with other applicable requirements such as the Flood Control Act of 1944 and the Federal Power Marketing Program, creates a "zone of interest" for preference customers, like the SeFPC members, that

Congress has specifically identified as beneficiaries of the Buford Project's operation. If the district court were to find that municipal and industrial water supply is a purpose of the Buford Project, SeFPC contends, then the Project's hydropower purpose would be jeopardized.

Georgia argues that SeFPC's argument is foreclosed by Greenwood Utils. Comm'n v. Hodel, 764 F.2d 1459 (11th Cir. 1985). In Greenwood, we stated that § 5 of the Flood Control Act of 1944, 16 U.S.C. § 825s, does not establish an entitlement to power. See id. at 1464-65. In reviewing Greenwood's claim that SEPA wrongly refused to sell it power, we held that the "plaintiff never had a property interest in the subject power that would entitle it to due process. Even preference entities have no entitlement to federal hyrdroelectric power." Id. at 1465. Georgia contends that this holding establishes that SeFPC has no legally protectable interest in the litigation, because it has no legally protectable interest in the amount of power it receives from the Buford Project.

SeFPC concedes that it does not have a legally protectable interest in a particular amount of power from the Buford Project, but denies that a claim to a certain amount of power forms the basis of its motion to intervene. Rather, SeFPC wishes to intervene in the litigation to show that the only congressionally authorized purposes of the Buford Project are hydropower and flood control—in

other words, that municipal water supply would be an illegal project purpose. The basis of its motion to intervene is thus to help the court determine whether municipal and industrial water supply has a right to the Buford Project's water storage, as claimed by Georgia, or whether hydroelectric production has a right to that water storage, as claimed by SeFPC. Thus, while preference customers may have no statutory entitlement to a specific amount of power, SeFPC argues that they do have a right to seek preclusion of unlawful uses of water storage that is used to produce hydropower, if those unlawful uses reduce the hydropower available for preference customers.

SeFPC argues that Greenwood is not applicable to this case because in Greenwood we found that there was simply no law to apply. There, we concluded that the Secretary of Energy had unfettered discretion to distribute and allocate surplus power among preference customers, so there was no legal basis for Greenwood's claim that it was wrongfully denied the right to purchase surplus power generated at the Corps' flood control dams. Greenwood, 764 F.2d at 1465. By contrast, according to SeFPC, where either the customer or the use of the water is unauthorized, there is law to apply, and the preference customers have a due process property interest in that hydropower and can challenge any attempt to reduce its availability.

26

SeFPC points out that in <u>United States ex rel. Chapman v. Federal Power Comm'n</u>, 345 U.S. 153, 156 (1953), the Supreme Court held that preference customers had standing to challenge the issuance of a hydroelectric license to a private utility that would have precluded federal development of the project and the resulting availability of hydropower to preference customers. If preference customers have standing in cases involving the allocation of hydropower between preference customers and non-preference customers, as was the case in <u>Chapman</u>, then according to SeFPC, they must also have standing to challenge a reduction of hydropower caused by the allegedly unlawful use of the water used to produce that power.

We agree with SeFPC that this case is more closely analogous to <u>Chapman</u> than to <u>Greenwood</u>. While SeFPC may not claim an entitlement to a certain amount of power vis-a-vis other preference customers, they do have a legally protectable interest in the production of hydropower at the Buford Project. Since the granting of Georgia's water supply request would result in a diminution of the overall production of hydropower, we find that SeFPC has a "direct, substantial and legally protectable interest in the subject matter of the suit."

2. *Impact of the Litigation on SeFPC's Ability to Protect Its Interest*

Although the district court concluded that SeFPC did not have an interest in

27

the subject matter of the litigation, it also found that denial of SeFPC's motion to intervene would not impede its ability to continue to negotiate with the Corps and to enforce its contracts regarding hydropower production or its ability to pursue its claims against the Corps in another lawsuit.

In the months prior to the case filed by Georgia in the district court, SeFPC sued the Corps in the U.S. District Court for the District of Columbia, alleging that the Corps had illegally allowed water withdrawals at Lake Lanier for the benefit of Georgia's municipal and industrial water users. See Southeastern Fed. Power Customers, Inc. v. United States Army Corps of Engineers, No. 1:00-CV-02975-TPJ (D.D.C. filed Dec. 12, 2000). SeFPC's suit is based upon the contention that water supply is not a primary purpose of the Buford Project and that the Corps is improperly operating the Buford Project. SeFPC thus argues that its ability to protect its interest could be impaired by the potential stare decisis impact of an decision in this lawsuit on the project purposes and operation of the Buford Dam. Georgia does not address this argument, but instead argues that SeFPC would have to address any claims arising out of the delivery of hydropower to SEPA, and SEPA is not a party to this lawsuit. Moreover, even if SEPA were a party, Georgia suggests that the district court would not have jurisdiction to hear SeFPC's claims against SEPA because disputes arising under contracts with the United States are to

28

be resolved in accordance with the Contract Disputes Act, 41 U.S.C. § 601, et seq. We find it unnecessary to address this argument because no contractual claims are at issue in this lawsuit.

In Chiles, we said that "[w]here a party seeking to intervene in an action claims an interest in the very property and very transaction that is the subject of the main action, the potential stare decisis effect may supply the practical disadvantage which warrants intervention as of right."  865 F.2d at 1214.   Because a final ruling in this case may adversely impact SeFPC's ongoing lawsuit against the Corps, we find that its interests could be impaired by the denial of intervention.

*3.  Ability of the Existing Parties to Represent SeFPC's Interest*

As discussed *supra*, the proposed intervenor has a minimal burden of showing that the existing parties cannot adequately represent its interest.  Trbovich, 404 U.S. at 538 n.10 (1972).  SeFPC argues that the Corps cannot adequately represent its interest because it believes that the Corps has been illegally diverting water at Lake Lanier for the allegedly unauthorized use of water supply since 1986—and, as noted above, has sued the Corps in another proceeding over the water diversions.  Thus, it contends that the Corps cannot be expected, in this proceeding, to protect SeFPC's interest in ensuring the continued production of hydropower at Lake Lanier in accordance with SeFPC's view of the

congressionally mandated project purposes.

Georgia replies that, whatever the relationship between the Corps and SeFPC in other contexts, in this proceeding their positions are identical: they both believe that Georgia's water supply request should be denied. As SeFPC notes, however, agreement on that conclusion does not mean that the Corps and SeFPC have identical positions or interests. The Corps seeks to protect its decision making process, whereas SeFPC seeks to protect the economic and statutory interests of its members. We do not believe that a federal defendant with a primary interest in the management of a resource has interests identical to those of an entity with economic interests in the use of that resource. See, e.g., Sierra Club, 18 F.3d at 1207-08. Accordingly, we believe that SeFPC has met its light burden of showing that the Corps will not adequately represent its interests.

*4. Whether SeFPC's Motion to Intervene Was Timely*

As a final matter, Georgia argues that SeFPC's motion to intervene should be denied because it was untimely filed. In determining whether a motion to intervene was timely, we consider (1) the length of time during which the proposed intervenor knew or reasonably should have known of the interest in the case before moving to intervene; (2) the extent of prejudice to the existing parties as a result of the proposed intervenor's failure to move for intervention as soon as it knew or

30

reasonably should have known of its interest; (3) the extent of prejudice to the proposed intervenor if the motion is denied; and (4) the existence of unusual circumstances militating either for or against a determination that their motion was timely. Chiles, 865 F.2d at 1213. However, we must also keep in mind that "[t]imeliness is not a word of exactitude or of precisely measurable dimensions. The requirement of timeliness must have accommodating flexibility toward both the court and the litigants if it is to be successfully employed to regulate intervention in the interest of justice." Id. (quoting McDonald v. E.J. Lavino Co., 430 F.2d 1065, 1074 (5th Cir.1970)).

Georgia contends that SeFPC's motion is untimely because SeFPC knew of the litigation and had copies of the papers in the case since February 2001, and did not move to intervene until August 2001, after discovery was largely complete and the parties had agreed upon a schedule for the briefing of the case. We do not believe that a delay of six months in itself constitutes untimeliness. See id. (finding motion timely when filed seven months after the case was filed). Although in Chiles we observed discovery had not yet begun, in this case SeFPC's intervention did not delay the proceedings and the court had yet to take significant action. Therefore, we do not believe that the existing parties will be prejudiced by SeFPC's intervention, and SeFPC would be prejudiced if its motion is denied. See

31

id. Accordingly, we find that its motion to intervene was timely.

Because we find that SeFPC was entitled to intervene as of right, we need not decide whether the district court abused its discretion in denying SeFPC's motion for permissive intervention pursuant to Rule 24(b)(2).[12]

## CONCLUSION

As explained herein, the decision of the district court denying Florida's motion to intervene is **REVERSED**. The district court's decision denying SeFPC's motion to intervene is **REVERSED**. The case is **REMANDED** for further proceedings.

---

[12]We note that the district court denied SeFPC's motion on the ground that "the Corps can adequately defend against Georgia's claims." That is not a factor for consideration under Rule 24(b)(2).